955 A.2d 886

NEW JERSEY SOCIETY FOR THE PREVENTION OF CRUELTY TO ANIMALS; FARM SANCTUARY; HUMANE SOCIETY OF THE UNITED STATES; AMERICAN SOCIETY FOR THE PREVENTION OF CRUELTY TO ANIMALS; ANIMAL WELFARE INSTITUTE; ANIMAL WELFARE ADVOCACY; SAVE OUR RESOURCES TODAY; WHOLE EARTH CENTER; CENTER FOR FOOD SAFETY; ORGANIC CONSUMERS ASSOCIATION; GLORIA BINKOWSKI, V.M.D.; GENESIS FARM; CONVENTRY FARM; MERRICK FARM; KELLER FARM; ARLEEN PAUL; HELGA TRACRETIER AND CRAIG DIBENEDICTUS, APPELLANTS–APPELLANTS, v. NEW JERSEY DEPARTMENT OF AGRICULTURE; CHARLES M. KUPERUS, SECRETARY, NEW JERSEY DEPARTMENT OF AGRICULTURE AND NEW JERSEY STATE BOARD OF AGRICULTURE, RESPONDENTS–RESPONDENTS.

Argued March 10, 2008—Decided July 30, 2008.

368

*Katherine A. Meyer,* a member of the District of Columbia bar, argued the cause for appellants (*Egert & Trakinski,* attorneys; *Ms. Meyer, Amy R. Trakinski* and *Leonard Egert,* on the briefs).

*Nancy Costello Miller,* Deputy Attorney General, argued the cause for respondents (*Anne Milgram,* Attorney General of New

Jersey, attorney; *Andrea M. Silkowitz*, Assistant Attorney General, of counsel).

*Linda J. Niedweske* submitted a brief on behalf of amici curiae The Monmouth County Society for the Prevention of Cruelty to Animals and The Cumberland County Society for the Prevention of Cruelty to Animals (*Niedweske Barber*, attorneys; *Ms. Niedweske, Kevin E. Barber*, of counsel and on the briefs).

*Ryan S. Lester* submitted a brief on behalf of amicus curiae Bernard E. Rollin, Ph.D.

Justice HOENS delivered the opinion of the Court.

In 1996, with little discernable fanfare, the Legislature enacted a new section of the existing statute regulating animal cruelty. Although that statute, since at least 1898, had essentially left animal welfare and the protection of animals to the New Jersey Society for the Prevention of Cruelty to Animals ("NJSPCA") and its related county organizations, the Legislature decreed that the Department of Agriculture ("the Department") would be vested with certain authority relating to the care and welfare of domestic livestock, commonly referred to as farm animals.

In doing so, the Legislature directed the Department to create and promulgate regulations that would set standards governing the raising, keeping, and marketing of domestic livestock, but it specified that the guiding principle to be utilized in establishing those standards was to be whether the treatment of these animals was "humane." The statute required the Department to consult with the New Jersey Agricultural Experiment Station[1] in developing and promulgating the regulations and established a presumption that compliance with those regulations would satisfy the other

---

[1] The New Jersey Agricultural Experiment Station is a component of Rutgers, The State University of New Jersey. Its mission is "[t]o enhance the vitality, health, sustainability and overall quality of life in New Jersey by developing and delivering practical, effective solutions to current and future challenges relating to agriculture; ..." New Jersey Agricultural Experiment Station, Vision and Mission Statement, http://njaes.rutgers.edu/about/ (last visited July 8, 2008).

statutory standards defining animal cruelty. Although vesting the Department with this rulemaking function, the Legislature left the preexisting enforcement mechanisms, which have long relied on the NJSPCA, largely undisturbed.

This matter presents us with a broad challenge to the regulations promulgated by the Department pursuant to this legislative directive. More particularly, we are called upon to consider whether the Department, in promulgating the regulations relating to the care of domestic livestock: (1) failed in general to comply with the mandate of the Legislature that it create standards that are "humane," either objectively or as tested against the definition that the Department itself adopted; (2) created an impermissibly broad and vague category of permitted practices by referring to "routine husbandry practices" as generally acceptable; (3) failed to create an adequate regulatory scheme by utilizing undefined or ill-defined terms that cannot serve as objectively enforceable standards; and (4) embraced a variety of specific practices that are either objectively inhumane or supported by inadequate scientific evidence as to their usefulness, or that fail to meet any accepted definition of the term humane.

In part, the issues before this Court require us to evaluate the very methodology utilized by the Department in its creation of the challenged regulations; in part, the issues before us raise questions and debates arising from deeply held notions concerning the welfare of animals generally. Nonetheless, the dispute before this Court has nothing to do with anyone's love for animals, or with the way in which any of us treats our pets; rather, it requires a balancing of the interests of people and organizations who would zealously safeguard the well-being of all animals, including those born and bred for eventual slaughter, with the equally significant interests of those who make their living in animal husbandry and who contribute, through their effort, to our food supply.

In the end, our focus is not upon, nor would it be appropriate for us to address, whether we deem any of the specifically challenged practices to be, objectively, humane. To engage in that

debate would suggest that we have some better understanding of the complex scientific and technical issues than we possibly could have, or that we are in some sense better able to evaluate the extensive record compiled by the Department than is that body itself. To engage in that discussion would also suggest that in a realm in which the Legislature has expressed its intention that an administrative agency bring its expertise to bear upon the issues, this Court is better equipped to do so. More to the point, it would suggest that we, rather than the Legislature or the Department, know which farming and livestock practices are objectively humane and which are not.

To accept such a challenge would be to overstep our role in our constitutional system, for it would be little more than our effort to substitute our view for that of the bodies authorized to act. It is, simply put, an invitation that we decline to accept. Rather, we confine our analysis, as we must, to a consideration about whether the agency in question did or did not carry out the function assigned to it by the Legislature, as tested in accordance with our ordinary standard of review of final agency actions and with due deference to the considerable expertise of that agency.

Notwithstanding all of the foregoing, our review of the record compels us to conclude that in its wholesale embrace of the regulations adopted by the Department, the Appellate Division erred. Because we find in those regulations both unworkable standards and an unacceptable delegation of authority to an ill-defined category of presumed experts, we conclude that the Department failed, in part, to carry out its mandate. We therefore conclude that some, but not all, of the regulations are invalid and we reverse only those aspects of the Appellate Division's judgment that concluded otherwise.

## I.

The statute that created the underpinnings for the challenged regulations was first introduced for consideration by the Legislature on March 3, 1994. Designated as Senate Bill 713, it proposed

the creation of an entirely new statutory section, and was entitled "AN ACT concerning domestic livestock and animal cruelty and welfare laws, amending *R.S.* 4:22–16, supplementing chapter 22 of Title 4 of the Revised Statutes and making an appropriation." The bill was designed to construct the framework for the adoption of standards to govern the care of domestic livestock as a part of the existing laws prohibiting cruelty to animals. The statement attached to the bill specified that "[i]t is the intent of this bill that it should be construed to allow the New Jersey Society for the Prevention of Cruelty to Animals ... in cooperation with the Department of Agriculture, to continue in the SPCA's statutory capacity to enforce the State's animal cruelty laws." Sponsor's Statement, *Statement to Senate Bill No. 713* (Mar. 3, 1994).

On March 21, 1994, the Assembly Economic and Community Development, Agriculture and Tourism Committee issued a statement to Senate Bill Number 713 using identical language to describe the "intent" of the bill. Thereafter, on June 2, 1994, the Senate Senior Citizens, Veterans Affairs and Agricultural Committee issued a statement "favorably report[ing] [on] Senate Bill No. 713 with committee amendments."[2] Among other things, the statement specified that "[i]t is the intent of this bill that it should be construed to allow the New Jersey Society for the Prevention of Cruelty to Animals ... in cooperation with the Department of Agriculture, to continue in the SPCA's statutory capacity to enforce the State's animal cruelty laws." Senate Senior Citizens, Veterans Affairs and Agricultural Committee, *Statement to Senate Bill No. 713* (June 2, 1994). The bill was passed by the Senate

---

[2] The amendments made in committee to the bill related, in large part, to the proposed amendment of another section of the statute. That amendment was designed to enact the presumption that adherence to the regulations that would be adopted would constitute compliance with the statutes prohibiting cruelty to animals. In addition, the committee made a minor amendment to the section that would require a warning prior to an arrest "for a first offense involving a minor or incidental violation" and reduced the proposed appropriation. *See* Senate Senior Citizens, Veterans Affairs and Agricultural Committee, *Statement to Senate Bill No. 713* (June 2, 1994).

later in June 1994 and by the Assembly, without further amendment, on December 18, 1995.

Acting pursuant to Article V, section I, paragraph 15 of the New Jersey Constitution, on January 5, 1996, Governor Whitman exercised her power to exercise an "item veto" to the $50,000 appropriation from the General Fund which was included in the bill. *See Karcher v. Kean*, 97 *N.J.* 483, 479 *A.*2d 403 (1984) (defining appropriation for purposes of conditional veto power). In doing so, however, the Governor "recognize[d] the merit of this bill and its goal of setting standards for humane treatment of domestic livestock.   ." The same day, the Legislature enacted the bill, absent the appropriation. *See L.* 1995, c. 311.

As enacted, the bill had two sections, the first of which was codified as *N.J.S.A.* 4:22–16.1. That section provides, in relevant part, as follows:

> a.   The State Board of Agriculture and the Department of Agriculture, in consultation with the New Jersey Agricultural Experiment Station and within six months of the date of enactment of this act, shall develop and adopt, pursuant to the "Administrative Procedure Act," P.L. 1968, c. 410 (*C. 52:14B–1* et seq.): (1) standards for the humane raising, keeping, care, treatment, marketing, and sale of domestic livestock; and (2) rules and regulations governing the enforcement of those standards.
>
> b.   Notwithstanding any provision in this title to the contrary:
>
> (1) there shall exist a presumption that the raising, keeping, care, treatment, marketing, and sale of domestic livestock in accordance with the standards developed and adopted therefor pursuant to subsection a. of this section shall not constitute a violation of any provision of this title involving alleged cruelty to, or inhumane care or treatment of, domestic livestock . . . .
>
> [*N.J.S.A.* 4:22–16.1.]

The bill also amended *N.J.S.A.* 4:22–16, which more generally defines the manner in which the animal cruelty statutes are to be construed. The bill added a new section that created an exception to the animal cruelty statutes for any activity or practice performed in accordance with the regulations that the Department was directed to promulgate. *See N.J.S.A.* 4:22–16(e). In addition, the bill extended the exemption granted in *N.J.S.A.* 4:22–16(a) for "[p]roperly conducted scientific experiments" performed under the authority of certain entities, by adding an exemption for such

activities as were authorized by the United States Department of Agriculture.

## A.

Notwithstanding the six month time frame within which the Department was directed to act, regulations designed to implement this statutory mandate were not drafted and published as proposed regulations for public comment until 2003. *See* 35 *N.J.R.* 1873–88 (May 5, 2003). In response to the proposed regulations, the Department received over 6,500 written comments, and heard testimony from numerous witnesses who appeared at a public hearing on the proposals. *See* 36 *N.J.R.* 2586(a) (June 7, 2004). After considering the comments and the testimony, the Department amended certain of the proposed regulations and formally adopted the regulations, to be codified at *N.J.A.C.* 2:8–1.1 to –8.7, on June 7, 2004. *See* 36 *N.J.R.* 2637–715 (June 7, 2004). In doing so, the Department stated that it intended to "establish the minimum level of care that can be considered to be humane." 36 *N.J.R.* 2637 (June 7, 2004). Moreover, the Department noted that the regulations were developed after extensive "consultations with the New Jersey Agricultural Experiment Station, as well as with other academicians, the New Jersey Society for the Prevention of Cruelty to Animals, veterinarians, Department staff, extension agents, producers, and allied industries." *Ibid.* As explained by the Department:

> [t]he rules were also developed with consideration of the Department's overarching mission as reflected in Governor James McGreevey's statement to Charles M. Kuperus, Secretary of Agriculture: "My charge to Charlie is clear—preserve our farms, fight for our farmers, and ensure that our agricultural industry is profitable and strong, innovative and poised for a bright future."
>
> [*Ibid.*]

As the Department understood its legislative mandate, and as it expressed that understanding as part of its adoption of these regulations in 2004, "[t]he rule proposal was designed to meet the complementary objectives of developing standards to protect animals from inhumane treatment and . . . fostering industry sustain-

ability and growth." *Ibid.* As adopted, the regulations are substantially similar to those that were originally proposed, but the notice and comment period had alerted the Department to a number of aspects of the regulations that were in need of amendment. Although a few of those amendments were included in the regulations as adopted, *see, e.g.,* 36 *N.J.R.* 2703 (June 7, 2004) (altering definition of induced molting in poultry); 36 *N.J.R.* 2704 (June 7, 2004) (altering definition of body condition scoring and providing scholarly reference in support), others were simultaneously issued as proposed amendments to the then newly adopted regulations, *see* 36 *N.J.R.* 2586(a) (June 7, 2004).

Relevant to the issues raised in this appeal, those proposed amendments sought to change the definition of "routine husbandry practices," 36 *N.J.R.* 2588 (June 7, 2004), in order to respond to comments about the meaning and intent of the original language.[3] After a further period of notice and comment, the Department explained that many of the comments it had received did not in fact respond to the amendments, but instead continued to debate the merits of the previously promulgated regulations. *See* 37 *N.J.R.* 2465(b) (July 5, 2005). Following its consideration and its further response to the comments that were relevant to the new proposals, the Department, on June 1, 2005, formally adopted the amendments to the earlier version of the regulations. *See* 37 *N.J.R.* 2465–74 (July 5, 2005) (adopting revisions to *N.J.A.C.* 2:8–1.2, –2.2, –2.6, –5.5, –7.2, –7.6, –8.1, and –8.6).

Finally, on April 3, 2006, the Department, responding to continued criticism of one part of the previously promulgated regulations, proposed a further amendment that would alter the definitions and the regulations relating to a specific practice used in the management of poultry. *See* 38 *N.J.R.* 1491(a) (Dec. 4, 2006). In particular, the newly proposed regulations were designed to limit

---

[3] The meaning and intent of the "routine husbandry practices" definition and the development of this aspect of the regulations are more fully addressed in Point VI, infra.

induced molting procedures and to ban full feed-removal forced molting [4] techniques. 38 *N.J.R.* 1492 (Dec. 4, 2006). There were two individuals who offered generally negative input during the notice and comment period, and the Department responded to those comments in adopting the amendments on October 26, 2006. *See* 38 *N.J.R.* 4991(a) (Dec. 4, 2006) (adopting amendments to *N.J.A.C.* 2:8–1.2, –4.2 and –4.4).

## B.

Petitioners[5] are a variety of entities, including the NJSPCA, and individuals which describe themselves collectively as "a wide coalition of animal protection organizations, consumers, farmers, and concerned citizens." Petitioners, many of whom had participated in the notice and comment process that led to the adoption of the regulations, raised this challenge to the final agency action adopting the regulations through an appeal in the Appellate Division,[6] *see R.* 2:2–3(a)(2).

---

[4] Any forced molting procedure is designed to increase egg production. These procedures do so by essentially forcing the hen to molt and to lay eggs on an unnatural schedule. As adopted, the regulations do not ban such procedures in general. However, full feed-removal forced molting, which involves starving fowl or poultry for fourteen days, has been deemed to be inhumane and it has now been banned.

[5] The petitioners who challenged some or all of the regulations and who sought certification before this Court are: New Jersey Society for the Prevention of Cruelty to Animals; Farm Sanctuary; Humane Society of the United States; American Society for the Prevention of Cruelty to Animals; Animal Welfare Institute; Animal Welfare Advocacy; Save Our Resources Today; Whole Earth Center; Center For Food Safety; Organic Consumers Association; Gloria Binkowski, V.M.D.; Genesis Farm; Conventry Farm; Merrick Farm; Keller Farm; Arleen Paul; Helga Tracretier; and Craig DiBenedictus.

[6] Petitioners first sought to pursue their challenge in July 2004, at which time the appeal was dismissed without prejudice in light of the fact that there were then still proposed, but unpromulgated, amendments to the regulations, most significantly, the proposed amendment to the definition of "routine husbandry practices." The Appellate Division therefore dismissed the appeal without prejudice to its reinstatement when the amendments were adopted and the

As part of the appeal, petitioners asserted that the regulations violated the directive of the Legislature as set forth in the statute itself. More particularly, petitioners contended that in adopting the statute, the Legislature expressed an intention to elevate the treatment of farm animals so as to permit only those practices, procedures, and techniques that meet the definition of "humane." As such, petitioners argued that the regulations fell short of that mandate in several particulars.[7] First, petitioners argued that several subsections of the regulations include a broadly-worded exemption for any practice that meets the definition of a "routine husbandry practice" and that the definition as adopted is both impermissibly vague and not grounded on any evidence in the record. Second, petitioners asserted that some of the subsections included vague or undefined terms and failed to create enforceable standards. Third, petitioners asserted that the regulations authorized a variety of specific practices that do not meet the Department's definition of "humane" and are not in fact humane.

In defending the regulations before the Appellate Division, the Department argued that they were consistent with both the intent and the spirit of the statute and supported by ample scientific evidence. In part, the Department argued that its statutory mandate required it to meet two public policy objectives, namely, preventing cruelty to animals and promoting the continuation of sustainable agriculture in New Jersey. The Department defended its election of "routine husbandry practices" as an appropriate criterion for its safe harbor exemption, explained how the regulations established objectively enforceable standards, and argued

_____

regulations finally were promulgated. The appeal was reinstated in July 2005 after the final adoption of the first group of amendments to the regulations; petitioners have not challenged the further amendment relating to forced molting.

[7] As part of the challenge before the Appellate Division, petitioners also argued that the enforcement aspects included in the regulations exceeded the scope of the Department's statutory authority and thus were invalid. The Appellate Division rejected this argument and the petition for certification did not include a challenge to that analysis of the Department's authority.

that none of the specific practices that petitioners challenged is in fact inhumane.

## C.

The Appellate Division, in an unpublished opinion, rejected each of petitioners' challenges and sustained all of the challenged regulations. Relying in large part on the presumption of reasonableness afforded to acts of administrative agencies and the deferential standard of review that courts employ when reviewing matters involving an agency's scientific or technical expertise, the Appellate Division found no basis on which to invalidate any part of these regulations.

The Appellate Division first rejected petitioners' argument that in creating the exemption for "routine husbandry practices," the Department had defined that phrase in a way that impermissibly delegated to others the creation of standards governing the humane treatment of farm animals. In considering this challenge, the Appellate Division found support in the statute's express direction to the Department to consult with the Agricultural Experiment Station, see N.J.S.A. 4:22–16.1(a), reasoning that this also permitted the Department to consider and rely upon other agricultural educational resources. In addition, the court, although agreeing with petitioners that an agency must create detailed standards based on factors it has found are relevant and persuasive, concluded that the Department met that standard by narrowing the "routine husbandry practices" definition so that it included only those practices that are commonly taught in the relevant educational institutions.

The Appellate Division also addressed petitioners' argument that certain of the regulations failed to create enforceable standards by relying on vague or undefined terms. It rejected petitioners' argument that the requirement relating to the "minimization of pain," as the basis for permitting certain practices, could not be sustained because it did not create a meaningful standard. Instead, the Appellate Division reasoned that the regu-

lation derives its content from the further requirement that the permitted techniques must be performed by trained people. Moreover, because the court was persuaded that the challenged practices can be humane even without the elimination of all pain, it concluded that the regulations were sufficiently supported by the record and were not unreasonable or arbitrary.

Finally, the Appellate Division separately considered and addressed each of the specific practices, permitted by the regulations, which were challenged by petitioners. As to each, after reviewing the record, the court concluded that the Department had collected voluminous information from a wide variety of sources and had examined the conflicting information about each practice before making a decision. Because each decision about a particular practice required the exercise of the Department's judgment, and because each was adequately supported by sufficient scientific and veterinary literature, the court concluded that deference to the agency was appropriate. In short, the Appellate Division reasoned that, based on the entire record considered by the Department, there was no ground on which to conclude that any of its decisions about the specific practices was arbitrary, capricious or unreasonable.

Petitioners sought certification from this Court, asserting a number of the challenges that they had raised before the Appellate Division. We granted that petition for certification, 192 *N.J.* 292, 927 *A.*2d 1291 (2007), and we thereafter granted leave to several entities and individuals to participate as amicus curiae.

## II.

Petitioners argue before this Court that the Appellate Division erred in its analysis and failed to recognize that the regulations authorize the continuation, as humane, of practices that are not. Asserting that the statute itself is remedial legislation entitled to be broadly read, petitioners argue that the Appellate Division failed to recognize the particular legislative purpose in utilizing the "humane" standard. According to petitioners, that standard

was used by the Legislature to avoid simply allowing the continuation of practices that are merely routine or common. They assert that the Legislature intended instead to require the Department to consider separately whether any particular practice, even if commonly or routinely utilized, is in fact humane. Petitioners urge us to conclude that although the Department recognized this mandate, as evidenced by the definition of humane that it adopted, its regulations fall short by ignoring that definition and by effectively doing precisely what the Legislature sought to avoid.

Reiterating the specific arguments they expressed before the appellate panel, petitioners urge this Court to invalidate the regulations in their entirety. They argue that the regulations, by relying on the "routine husbandry practices" definition, created a safe harbor that cannot be sustained. Petitioners point out that because the definition of this phrase permits any practice, and equates it with a humane practice, if it is "commonly taught" at a wide variety of educational institutions, it amounts to an impermissible delegation of the Department's authority and permits as humane those practices that are not. Before this Court, petitioners have expanded this argument to include an assertion that the Department, in including this wide assortment of educational and other institutions within its definition, failed to review or analyze their curricula or their programs to ensure that any of them actually teaches practices that are humane. They assert that because of this shortcoming, the Department acted without an essential basis in the record, resulting in the adoption of regulations not entitled to the Court's deference.

Petitioners also reiterate the other arguments that they pressed before the Appellate Division, They urge the Court to conclude that the regulations fail to set an enforceable standard by utilizing language, such as "minimize pain," without further definition, so as to provide insufficient guidance to those charged with enforcement and that the regulations therefore fail to establish any standard. Finally, they point to a large number of particular practices that are permitted to be performed by the regulations but that, they

assert, are not humane in accordance with the Department's definition or which are of dubious benefit according to the scientific evidence. In short, because the regulations have both specific shortcomings and general ones, petitioners urge this Court to invalidate the regulations in their entirety.

The Department urges this Court to affirm the Appellate Division's carefully analyzed and lengthy opinion and to uphold the regulations both in general and in all of their particulars. More specifically, the Department argues that its regulations should be afforded great deference and that the Appellate Division correctly determined that petitioners did not meet their heavy burden to overcome the agency's expertise in setting up appropriate standards. It stresses that its regulations are supported by an extensive record and represent its considered judgment in carrying out its role of both promoting viable agriculture and ensuring animal and public health.

The Department argues in particular that its "routine husbandry practices" exemption is consistent with the statutory mandate and is an appropriate means to permit the continuation of practices that should be permitted. It points out that in response to criticism that its original definition of "routine husbandry practices" was too broad, it introduced and adopted the amended definition, limiting such practices only to those that are "commonly taught" at veterinary schools, land grant colleges,[8] and universities or by agricultural extension agents. At the same time, the Department urges the Court to reject petitioners' assertion that it did not review the curricula of these institutions before relying on them as part of its safe harbor. The Department notes instead that it consulted with educators and experts, reviewed various

---

[8] The National Association of State Universities and Land–Grant Colleges explains that "[a] land-grant college or university is an institution that has been designated by its state legislature or Congress to receive the benefits of the Morrill Acts of 1862[, 7 *U.S.C.A.* §§ 301 to 308] and 1890[, 7 *U.S.C.A.* §§ 321 to 329]." The Land–Grant Tradition (1995), available at http://www.wvu.edu/~exten/about/land.htm (last visited July 8, 2008).

curricula, texts, federal and state statutes, as well as state and national standards, and asserts that it therefore fully discharged its statutory obligations.

The Department also urges this Court to reject petitioners' other arguments that the regulations fail to establish enforceable standards, as well as the challenges to each of the specific practices that the agency elected to include within the subsections identifying techniques that are permissible. It asserts that it has faithfully carried out its mandate to ensure that the practices used in animal husbandry are humane, and has exercised its expertise in order to do so. In support of this argument, the Department explains that in those cases in which it identified practices that are not humane, it has acted to eradicate them, pointing to its decision to ban full feed-removal forced molting.

The Department argues that the regulations set forth a baseline of behavior that farmers are free to exceed if they so desire and explains that underlying the regulations it adopted is the belief that farmers genuinely care for their animals and are aware of the basics of animal biology and behavior. As such, the Department urges us to reject the arguments raised by petitioners and to agree with the Appellate Division that there is no ground on which to invalidate any aspect of the regulations.

In addition to the arguments made by petitioners and by the Department, we granted leave to a number of other interested individuals and entities to file briefs as amicus curiae. In particular, the Monmouth County Society for the Prevention of Cruelty to Animals and the Cumberland County Society for the Prevention of Cruelty to Animals filed a joint brief in which they supported the arguments advanced by petitioners. They argue that the exemption in the regulation for "routine husbandry practices" fails to create an enforceable standard, that in adopting it the Department failed to review the curricula of the institutions that will serve as the arbiter of what is either routine or commonly taught, and that the exemption therefore is an impermissible delegation of the Department's statutory mandate. Moreover, they assert that

this exemption impairs the ability of any of the SPCAs to carry out their obligation to enforce the anti-cruelty laws. In addition, they argue that the Department, in adopting the safe harbor based on "routine husbandry practices," impermissibly embraced and permitted numerous practices that have not been demonstrated to be humane, and thus failed to adhere to the statutory mandate that it only authorize those practices that it has concluded have been shown affirmatively to be humane. Finally, they argue that the Department failed to apply the very standard of "humane" that its own regulations adopted.

Bernard E. Rollin, Ph.D., who identified himself as an animal welfare expert, also filed a brief, as amicus curiae, in which he raised other concerns about the challenged regulations. The gravamen of his argument is that many practices and procedures used in veterinary medicine, including many that are commonly used and taught in veterinary schools, are not humane, with the result that many practices that would meet the regulation's safe harbor definition of being "routine husbandry practices" cannot also be defined as humane. He further argues that the Department failed to discharge its statutory mandate because it relied on entities whose focus is on economic productivity rather than on animal welfare. He urges this Court to recognize that our Legislature chose instead a loftier standard, one that the Department was directed, but failed, to enforce, thus requiring that the regulations be invalidated.

### III.

We begin with a recitation of the well-established principles that inform our review of the final decisions of administrative agencies like the Department. Because the challenge brought by petitioners proceeds on multiple levels, we set forth the standards that apply to each.

First, the general parameters of our review are not controversial. Appellate courts ordinarily accord deference to final agency actions, reversing those actions if they are "arbitrary,

capricious or unreasonable or [if the action] is not supported by substantial credible evidence in the record as a whole." *Henry v. Rahway State Prison,* 81 *N.J.* 571, 579–80, 410 *A.*2d 686 (1980). Similarly, an appellate court generally will not reverse an agency action, including its action in promulgating regulations, unless: (1) the regulations at issue "violate[ ] the enabling act's express or implied legislative policies;" or (2) "there is [not] substantial evidence in the record to support the findings on which the agency based its action;" or (3) "in applying the legislative policies to the facts the agency clearly erred by reaching a conclusion that could not reasonably have been made upon a showing of the relevant factors." *In re Rulemaking, N.J.A.C. 10:82–1.2 & 10:85–4.1,* 117 *N.J.* 311, 325, 566 *A.*2d 1154 (1989).

■■■■ Moreover, in our review of an agency's interpretation of statutes within its scope of authority and its adoption of rules implementing its enabling statutes, we afford the agency great deference. *In re Freshwater Wetlands Prot. Act Rules,* 180 *N.J.* 478, 489, 852 *A.*2d 1083 (2004). As we have explained: "[s]uch deference is appropriate because it recognizes that 'agencies have the specialized expertise necessary to enact regulations dealing with technical matters and are "particularly well equipped to read ... and to evaluate the factual and technical issues that ... rulemaking would invite." ' " *Ibid.* (quoting *N.J. State League of Muns. v. Dep't of Cmty. Affairs,* 158 *N.J.* 211, 222, 729 *A.*2d 21 (1999) (quoting *Bergen Pines County Hosp. v. N.J. Dep't of Human Servs.,* 96 *N.J.* 456, 474, 476 *A.*2d 784 (1984))). For this reason, we begin with a presumption that an agency's regulations are both valid and reasonable and we place on the challenging party the burden of proving that the regulation violates the statute. *N.J. State League of Muns., supra,* 158 *N.J.* at 222, 729 *A.*2d 21.

■■■ Nevertheless, if a regulation is "inconsistent with the statute it purports to interpret," *Smith v. Dir., Div. of Taxation,* 108 *N.J.* 19, 26, 527 *A.*2d 843 (1987), it will be invalidated. As we have held, an agency "may not under the guise of interpretation ...

give the statute any greater effect than its language allows." *Kingsley v. Hawthorne Fabrics, Inc.,* 41 *N.J.* 521, 528, 197 *A.*2d 673 (1964). "Thus, if the regulation is plainly at odds with the statute, [the court will] set it aside." *In re Freshwater, supra,* 180 *N.J.* at 489, 852 *A.*2d 1083 (citing *N.J. Tpk. Auth. v. Am. Fed'n of State, County & Mun. Employees, Council 73,* 150 *N.J.* 331, 351, 696 *A.*2d 585 (1997)).

█ Even if a regulation falls within the scope of the agency's legislative authority, it will nonetheless be invalidated if the agency "significant[ly]" fails "to provide ... regulatory standards that would inform the public and guide the agency in discharging its authorized function," *Lower Main St. Assocs. v. N.J. Hous. & Mortgage Fin. Agency,* 114 *N.J.* 226, 235, 553 *A.*2d 798 (1989) (citing *Dep't of Envtl. Prot. v. Stavola,* 103 *N.J.* 425, 436–38, 511 *A.*2d 622 (1986); *Dep't of Labor v. Titan Constr. Co.,* 102 *N.J.* 1, 12–18, 504 *A.*2d 7 (1985)), because a failure of that magnitude raises due process concerns. *See Crema v. N.J. Dep't of Envtl. Prot.,* 94 *N.J.* 286, 301, 463 *A.*2d 910 (1983). As we have explained, the "deference [we afford to agencies] does not require abdication by the judiciary of its function to assure that agency rulemaking conforms with basic tenets of due process, and provides standards to guide both the regulator and the regulated." *Lower Main St., supra,* 114 *N.J.* at 236, 553 *A.*2d 798. In keeping with these familiar standards, we turn to our review of the particular regulations in issue.

## IV.

Petitioners attack the regulations both generally and specifically, as a result of which our analysis must proceed in like fashion. We therefore begin with a consideration of whether the regulations in general are invalid.

## A.

The regulations themselves are divided into several subchapters, each of which addresses a different aspect of the statutory

mandate in the context of the care and treatment of domestic livestock. The first part of the regulations, *N.J.A.C.* 2:8–1.1 to – 1.2, sets forth the agency's statement of purpose, its presumption that acts in accordance with the regulations will "not constitute cruelty ... or inhumane care and treatment" in violation of the statute, *N.J.A.C.* 2:8–1.1, and lists the definitions that shall apply to the terms used in the regulations, *N.J.A.C.* 2:8–1.2.

The next six subchapters of the regulations set forth standards that relate to particular types of domestic livestock, including cattle, *N.J.A.C.* 2:8–2.1 to –2.7; horses, *N.J.A.C.* 2:8–3.1 to –3.7; poultry, *N.J.A.C.* 2:8–4.1 to –4.8; rabbits, *N.J.A.C.* 2:8–5.1 to –5.8; small ruminants,[9] *N.J.A.C.* 2:8–6.1 to –6.7; and swine, *N.J.A.C.* 2:8–7.1 to –7.7. Although each of these subchapters includes subsections about similar areas of raising, keeping, or caring for domestic livestock that are being regulated and although each includes certain standards that apply generally to all domestic livestock, the majority of each subchapter is devoted to individualized practices and management techniques for each animal or group of animals.

For example, each includes subsections setting forth general provisions, as well as standards relating to "feeding," "watering," "keeping," "marketing and sale," and "care and treatment" of the particular group of animals in question. Each subchapter, however, also includes a subsection entitled "exceptions," that creates a so-called "safe harbor" provision. As to each type of farm animal, this provision identifies a number of particular practices that are explicitly permitted if they are performed by "knowledgeable individuals in a sanitary manner in a way to minimize pain," and authorizes other techniques by reference to "routine husbandry practices" as defined in *N.J.A.C.* 2:8–1.2.

---

[9] The regulations define small ruminants as follows: "'Small ruminants' include sheep, goats, llama, alpaca, and farm-raised Cervidae." *N.J.A.C.* 2:8–1.2.

The final subchapter of the regulations, *N.J.A.C.* 2:8–8.1 to –8.7, provides standards governing "the investigation and enforcement of alleged violations of humane standards" applicable to domestic livestock.

## B.

In order to fully appreciate the challenges to the regulations and, in particular, the effect of the subsections that either explicitly permit certain practices or establish a. safe harbor, we turn briefly to an analysis of the more general provisions of the laws that are designed to prevent and to punish cruelty to animals. The statutory provisions relating to the prevention of cruelty to animals are found in Chapter 22 of Title 4, which is devoted to Agriculture. As it is currently codified, that Chapter continues the existence of the NJSPCA and its county societies, *see N.J.S.A.* 4:22–11.1 to –11.7, and it creates standards for the training and commissioning of humane law enforcement officers and agents, *N.J.S.A.* 4:22–11.8 to –11.9, and for animal protection law enforcement officers and agents, *N.J.S.A.* 4:22–11.10 to –12. The Chapter also includes an extensive series of sections relating to the enforcement of the laws preventing cruelty to animals, the methods for detection and investigation, and the penalties, both criminal and civil, that may be imposed for violations of the statute.

As an integral part of the enforcement scheme, Chapter 22 includes several sections that define the meaning and scope of animal cruelty and its prevention. It does so in part by defining both in general and in very specific terms the acts that will constitute cruelty and by identifying the penalties, both civil and criminal, that will be imposed for particular violations. *See, e.g., N.J.S.A.* 4:17 to :26.[10]

---

[10] The statute includes another section, quite different from the remainder of the Chapter, enacted by the Legislature in 2007, *see L.* 2007, *c.* 210 (eff. Dec. 20, 2007), to regulate product testing on animals. *See N.J.S.A.* 4:22–58 to –60. Unlike the other sections of the Chapter, these provisions are exclusively en-

In addition, however, the statute specifies a large variety of acts and practices that shall not be "prohibit[ed] or interfere[d] with," that is, acts and practices that shall not, by definition, constitute cruelty. *See N.J.S.A.* 4:22–16. These acts and practices include, for example, certain rather broadly defined scientific experiments,[11] training of dogs for various purposes, and hunting and fishing in accordance with relevant regulations as to time and manner. It is in this section of the statute that the Legislature added, as part of the 1996 statutory amendment, a general exception from the acts comprising cruelty for "raising, keeping, care, treatment, marketing, and sale of domestic livestock" if performed in accordance with the regulations that were to be adopted pursuant to *N.J.S.A.* 4:22–16.1. *See N.J.S.A.* 4:22–16 (codifying *L.* 1995, *c.* 311, § 2).

The statute therefore, although it generally prohibits acts and practices that constitute cruelty, also explicitly permits other acts that fall within one of its exceptions. For purposes of this appeal, the result is that any act that meets the standards embodied in the Department's regulations as a permitted act, practice or technique, is, by definition, not an act of cruelty. As a result, all of the acts included in the several "safe harbor" provisions of these regulations, as long as they are performed in accordance with the standards that those provisions impose, are permitted by the statute because, by definition, they are not acts of cruelty.

By extension, however, if the safe harbor provisions themselves cannot be sustained, or if one or more of the acts now included in the safe harbor provisions lacks sufficient support in the record for it to withstand our review, the effect would not be that any of these procedures is banned. Rather, the effect would be that any

---

forced by the Attorney General through application to an appropriate court for injunctive relief. *N.J.S.A.* 4:22–60.

[11] Notably, any analysis of this subsection would likely also require consideration of the impact of the recently enacted provisions relating to restrictions on use of animals for product testing. *See N.J.S.A.* 4:22–58 to –60.

of them could still be performed if otherwise consistent with the statutory definition of what is cruel and what is not. That is to say, even if this Court were to strike the safe harbor subsections in their entirety or strike the inclusion of specific practices that are now there permitted, it would not constitute a ban on those practices. Instead, the ordinary statutory provisions regarding what acts constitute cruelty, as well as those that govern the detection, investigation, and prosecution of violations, would operate as the appropriate regulatory mechanism pending promulgation of new regulations by the Department.

We turn, then, to a consideration of the issues raised in this appeal, which we analyze in light of this statutory and regulatory framework.

## C.

In its lengthy consideration of the questions about animal cruelty in the context of domestic livestock, the Department compiled an extensive record. That record includes a wide variety of materials, representing input from numerous organizations (e.g., Animal Welfare Institution, National Pork Board, United Egg Producers), individuals and interest groups from New Jersey and nationally (e.g., Temple Grandin, Bernard Rollin, People for the Ethical Treatment of Animals, Farm Sanctuary, Professional Rodeo Cowboys Association), as well as materials from other states (e.g., Pennsylvania, New York, Maine, Texas, West Virginia, Montana, New Mexico), and even from other countries (e.g., England, Australia, New Zealand).

The record before this Court is not only extensive, but it is broad in its scope. On its face, the record demonstrates that the Department took seriously its charge to consider all aspects of the questions about the welfare of domestic livestock. In doing so, the Department did not simply consider the views and the input of farmers, agriculture professionals and their trade organizations, but it also received and took into account the views of animal rights activists and animal welfare organizations.

At the same time, the Department received input into its decisions from a wide variety of professionals, scholars, veterinarians, and other experts in all phases of animal welfare, animal health, and farming practices. The record includes a large number of scientific studies and scholarly publications reflecting both existing practices and trends, in this country and abroad, and representing current thinking about humane practices in the fields of animal husbandry, veterinary sciences, and agriculture. In addition, during the rulemaking process, the Department received and responded to thousands of comments, including many objections to its proposed regulations, in its effort to adopt regulations that more accurately carried out the legislative goal of ensuring that farm animals are treated humanely.

The Statement of Items Comprising the Record and the Supplemental Statement of Items Comprising the Record are lengthy and the record they reflect, for purposes of appellate review, is voluminous. Nevertheless, merely compiling a thick record, only amassing evidence, and simply responding to specific objections, will not suffice to sustain the agency's actions if the regulations themselves fall short either in general or in particular. We turn, therefore, to the general and the specific arguments that petitioners have raised.

### V.

Petitioners first assert that the regulations, in their entirety, fail to carry out the fundamental goal of the Legislature to have the Department create regulations that embody standards that are humane. They assert that the regulations neither comply with the meaning of humane as it is contemplated by the statute, nor do they even accord with the definition of humane that the agency itself adopted.

■ Petitioners first point out that, in enacting the statute, the Legislature referred explicitly to "humane" practices relating to livestock rather than, as other states have done, referring to a lesser standard, such as "routine" or "commonly practiced" man-

agement techniques. In order to give full meaning and effect to the intent of the Legislature, therefore, petitioners argue that the agency was required to look beyond the practices currently utilized and to identify and permit only those practices that meet this higher standard, but that it failed in this mission.

More to the point, petitioners point out that the Department itself adopted a definition of humane that many of the practices that are explicitly permitted or that fall within the safe harbor cannot meet. Although they point to several particular practices that they argue are examples of the way in which the regulations fall short, petitioners insist that this defect is so pervasive that the regulations cannot be sustained at all.

The Department argues that its regulations do not violate the requirements of the statute. The Department rejects the suggestion that the statute required an elevated standard and asserts that nothing in the regulations in fact violates the definition of humane that it adopted.

Our review of this record compels us to reject both aspects of petitioners' broad attack on these regulations. The statute that directed the Department to enact regulations relating to animal cruelty and adoption of humane practices, *N.J.S.A.* 4:22–16.1, comes to this Court with virtually no legislative history. The scant evidence that surrounds its passage, the conditional veto message, and the references included in various pronouncements in the time since its enactment, do not include evidence from which we can conclude that it was enacted as a response to complaints about particular agricultural practices or to domestic livestock management techniques generally. To be sure, we regard it as remedial legislation and we interpret it in that light, *see, e.g., Serv. Armament Co. v. Hyland,* 70 *N.J.* 550, 559, 362 *A.*2d 13 (1976), but there is no clue in this record about any particular evil that the legislation was designed to eradicate or even to remedy.

Plainly, the Department recognized that part of its charge was to adopt regulations that would ensure that the treatment of farm animals was humane, as opposed to merely reciting those practices

that were accepted, routine, common, or prevalent. Just as plainly, the Department understood that the effectuation of its legislative mandate required that it adopt a definition of humane, because this is the critical term in the statute. As a result, the Department included in its regulations, both as originally proposed and as finally adopted, the following definition: " 'Humane' means marked by compassion, sympathy, and consideration for the welfare of animals." *N.J.A.C.* 2:8–1.2(a).

In addition, although not part of the definition of "humane," the Department also proposed and adopted definitions of two related terms. As such, it defined both "Animal welfare" and "Well-being." The former, which is included in the list of defined terms, "means a state or condition of physical and psychological harmony between the animal and its surroundings characterized by an absence of deprivation, aversive stimulation, over stimulation or any other imposed condition that adversely affects health and productivity of the animal." *Ibid.* The latter, found in the same part of the regulations, is defined as follows: " 'Well-being' means good health and welfare." *Ibid.*

We do not read in this statute or in these definitions any standard that requires that the regulations be invalidated in their entirety. In order to do so we would need to conclude either that the agency failed to consider the requirement of the statute that "humane" treatment be the touchstone or that, in light of the statutory standard and the definition adopted by the Department itself, its regulations as a whole are arbitrary, capricious or unreasonable. Indeed, because these regulations are the expression of the agency's determinations in an area within its technical expertise, in order to invalidate them in their entirety, we would need to discern an inherent flaw in the very process by which they were drafted and adopted or in the record that supports them.

The extensive record and careful response of the Department to the overwhelming number of comments does not permit us to so conclude. Even though there may be particular practices that the regulations specifically embrace and that might fall short of this

lofty language, we cannot say that this is true as to each and every aspect of the regulations, or as to all of the practices that they permit.

For example, the regulations include a relatively large number of completely uncontroversial matters. Included in this category are subsections regulating feeding practices based on particular methods for measurement of body condition of cattle, *N.J.A.C.* 2:8–2.2(b)(1), adopting specific body condition scoring (BCS) methods, *N.J.A.C.* 2:8–2.2(b)(2), and establishing minimum BCS requirements, with specific feeding requirements for those which do not meet those criteria, *N.J.A.C.* 2:8–2.2(b)(4) to –2.2(b)(6). As it relates to "replacement dairy heifers," the particular BCS scoring methodology was altered from the one used in the regulations as originally proposed to a different one after the comment period. *Compare* 35 *N.J.R.* 1877 (May 5, 2003) (proposing use of scoring method devised by M.A. Wattiaux, *Body Condition Scores,* Chapter 12, Dairy Essentials (1999), which was published by The Babcock Institute for International Dairy Research and Development, University of Wisconsin–Madison, Madison, Wisconsin) *with* 36 *N.J.R.* 2704 (June 7, 2004) (altering scoring method and citing R.A. Patton et al., *Body Condition Scoring—A Management Tool* (Sept. 1988), which was published by The Department of Animal Science, Michigan State University, East Lansing, Michigan). Other matters included in the subchapter concerning cattle, for example, set forth broadly applicable requirements relating to adequate provision of water, *N.J.A.C.* 2:8–2.3, that have not been attacked as failing to meet any of the definitions of "humane" or its related terms as adopted by the Department.

Likewise, the regulations governing many similar matters relating to the other types of farm animals are not challenged and appear to be uncontroversial in terms of whether or not they represent techniques that are humane. Regardless of one's personal view of the overall regulatory scheme or of domestic livestock management in general, the regulations as a whole are consistent with the meaning of the term "humane."

In so concluding, we are guided by two considerations. First, petitioners suggest that they have merely pointed to specific examples of treatment that they have identified as falling short of the definition of "humane," in an effort to illustrate a larger defect in the regulations. They argue that these examples alone should suffice to prove the bankruptcy of the process used by the Department in adopting the regulations and should therefore support a decision to invalidate the regulations in their entirety.

We, however, do not agree. Rather, we interpret petitioners' failure to suggest that the great majority of the practices permitted in these apparently uncontroversial requirements are not humane, as significant. That failure is instead evidence that they are not so wide of that mark that they constitute an agency action with which we should interfere. Although one or another of the specifically challenged practices within the regulations may individually fall short of the standard of review that we employ, that is an insufficient ground on which to invalidate the whole. *See, e.g., Heir v. Degnan,* 82 *N.J.* 109, 126–28, 411 *A.*2d 194 (1980) (upholding alcohol price control and competition regulations notwithstanding invalidation of specific provisions).

Second, the record reflects that the Department has considered objections to some of the originally proposed and adopted regulations and then concluded, on further review, that the objections were meritorious. In particular, as it relates to the challenged practice of full feed-removal during induced molting, the Department has not only been responsive to the continued objections to that particular technique, but has concluded that it should be banned. *See* 38 *N.J.R.* 4991(a) (Dec. 4, 2006). Far from the picture of an agency held hostage by the interests of agribusiness that petitioners would paint, the Department has not been unresponsive to arguments about specific practices that do not meet its definition of those that are humane.

These two considerations, in addition to our review of the record on appeal itself, inform our decision. The specific challenges to the regulations, both as to particular practices and as to the safe

harbor provisions, do not, in and of themselves, nor in the larger context of the regulatory process, suggest that the Department failed to propose and adopt regulations that are essentially grounded upon a determination about what practices are humane. In the absence of some evidence that the regulations include some pervasive defect in process or content, we decline to invalidate them in their entirety.

## VI.

Petitioners next challenge the inclusion in the regulations of language creating a safe harbor for any act or technique that meets the definition of "routine husbandry practices." *N.J.A.C.* 2:8–1.2. This exception, included in one of the subsections of each subchapter, *see, e.g., N.J.A.C.* 2:8–2.6(f) (cattle); *N.J.A.C.* 2:8–4.7(e) (poultry); *N.J.A.C.* 2:8–7.6(d) (swine), essentially authorizes the use of any and all techniques that meet this definition because it identifies this class of practices as not being prohibited.[12]

The phrase "routine husbandry practices" is among the terms that the Department included in its section on definitions as follows:

> "Routine husbandry practices" means those techniques commonly taught by veterinary schools, land grant colleges, and agricultural extension agents for the benefit of animals, the livestock industry, animal handlers and the public health and which are employed to raise, keep, care, treat, market and transport livestock, including, but not limited to, techniques involved with physical restraint; animal handling; animal identification; animal training; manure management; restricted feeding; restricted watering; restricted exercising; animal housing techniques; reproductive techniques; implantation; vaccination; and use of fencing materials, as long as all other State and Federal laws governing these practices are followed.

> [*N.J.A.C.* 2:8–1.2.]

---

[12] In actuality, the regulations also require that, in order to be included in the safe harbor, any such practice must also be "performed in a sanitary manner by a knowledgeable individual and in such a way as to minimize pain." *See, e.g., N.J.A.C.* 2:8–2.6(f). That aspect of the safe harbor is separately challenged by petitioners and we consider this separate criterion in the context of the specific practices that petitioners have attacked. *See* Point VII.B., *infra.*

Petitioners assert that the definition of "routine husbandry practices" is so broad and all-encompassing that it amounts to an improper delegation of the agency's authority, contrary to its legislative mandate. Moreover, they argue that the record reveals that the Department, in adopting this definition and this standard for what constitutes "humane," failed to even review or evaluate the practices that it would permit. In particular, they assert that the definition includes a wide variety of institutions,[13] each of which has become the arbiter of which practices are humane, but that the Department did not undertake any analysis of these institutions. In part, they point out that the record includes no evaluation of any of the texts used or the curricula that they follow, and no investigation of their course catalogs or instructional personnel. In short, petitioners argue that there is nothing in the record that would suggest that any of these institutions teaches practices that would meet the Department's own definition of "humane."

Amicus Rollin concurs, arguing that merely because a practice is routinely employed or taught, even if taught at a veterinary school, does not mean that it is humane. Rather, he argues that many practices taught at these institutions are motivated by concerns about the economics of agriculture, focusing on productivity alone, and ignoring any concerns about the welfare of the animals involved. As such, he argues that these practices, even if commonly taught, simply cannot be equated with practices or techniques that are also humane.

The Department argues that there is nothing in its definition of "routine husbandry practices" that fails to meet its mandate. It argues that the record fully supports its decision to rely on a variety of educational institutions as a mechanism to define and to identify permissible practices, contending that this choice was in

---

[13] Although the definition includes institutions, it also includes agricultural extension agents, who are plainly individuals. Nevertheless, we intend to refer to the entire category of "veterinary schools, land grant colleges, and agricultural extension agents" through our use of the term "institutions."

keeping with its charge to create regulations that are "humane." In particular, the Department asserts that it undertook to review a variety of texts and curricula from many educational institutions as part of its consideration of this part of the regulations.

In support of its decision, the Department also points out that the statute itself directed the agency to cooperate with the New Jersey Agricultural Experiment Station, suggesting that this is evidence that the Legislature intended that the agency would rely on similar institutions, even to the point of including them within the safe harbor exception. Finally, the Department asserts that its mandate was not to create a complex series of detailed regulations about particular practices, but to implement general standards that would permit individual farmers to utilize their judgment in the same way that regulations governing doctors or accountants operate. In light of these considerations, the Department urges us to reject the challenge to the "routine husbandry practices" exception.

■ As adopted, this exception is different from the one that was proposed. To be sure, the originally proposed regulations included an exception for "routine husbandry practices," but defined that term in broader language. In place of the opening phrase in the regulations as adopted that refers to "techniques commonly taught by veterinary schools, land grant colleges, and agricultural extension agents," the original proposal included a different measuring stick. It referred to "techniques commonly employed and accepted as necessary or beneficial to raise, keep, care, treat, market, and transport livestock ..." 35 *N.J.R.* 1877 (May 5, 2003). During the notice and comment period, this standard was strongly criticized, both because it was inherently vague and for its apparent inclusion of practices that are not humane. *See, e.g.,* 36 *N.J.R.* 2642, 2672 (June 7, 2004). In response, the Department commented that its initial definition "did not clearly reflect its intent that only those techniques commonly taught by veterinary schools, land grant colleges, and agricultural extension agents are considered appropriate." 36

*N.J.R.* 2642 (June 7, 2004). For this reason, the Department immediately proposed amendments to the regulations that resulted in the definition as it now stands. 36 *N.J.R.* 2588 (June 7, 2004).

Notwithstanding its assertion that the revised definition more accurately reflected its intent, and notwithstanding its insistence that its review was careful prior to its decision to effectively place into the hands of this wide-ranging and ill-defined group of presumed experts the power to determine what is humane, there is no evidence in the record that the Department undertook any review, organized or passing, of what these institutions actually teach. On the contrary, there is clear evidence in the record that the Department only attempted to collect and review the curricula of any of these institutions during the pendency of the appeal to this Court. Although one might well debate whether review of curricula or course guides alone would be sufficient, failing to do so at all leaves the agency's decision to rely on these institutions without any basis in the record.

Nor is there any evidence that the Department considered whether the techniques taught in these institutions, whatever those techniques might be, rest in any way on a concern about what practices are humane or have any focus other than expedience or maximization of productivity. Contrary to the Department's assertion, there is no evidence that it considered the intersection between the interests of those who attend these institutions or are taught by them and those who are concerned with the welfare of the animals.

Our review of this aspect of the appeal leads us to conclude that this part of the safe harbor exemption demonstrates two separate flaws. First, it cannot be denied that in enacting this statute, the Legislature directed the Department to achieve a specific goal and that it chose to do so in language that differed from similar statutes in other states. It is significant that the Legislature sought to exempt only "humane" practices from prosecution under the cruelty code. Whereas other states have exempted routine,

common, or accepted practices from their cruelty codes, *see, e.g.,*
18 Pa. Cons.Stat. Ann. 5511(c)(3) (exempting activities in "normal"
agricultural operation from prosecution in Pennsylvania); Colo.
Rev.Stat. 18–9–201.5(1) (authorizing "accepted" animal husbandry
practices in Colorado), our Legislature chose not to use that
language, selecting a different course.

To suggest, as the Department's "routine husbandry practices"
definition implies, that the Legislature meant "routine" when it
said "humane" would "abuse the interpretive process and . . .
frustrate the announced will of the people." *Serv. Armament Co.,
supra,* 70 *N.J.* at 559, 362 *A.*2d 13 (quoting *Phillips, Inc. v.
Walling,* 324 *U.S.* 490, 493, 65 *S.Ct.* 807, 808, 89 *L.Ed.* 1095, 1099
(1945)); *see City of Passaic v. Local Fin. Bd.,* 88 *N.J.* 293, 298,
441 *A.*2d 736 (1982) (quoting *Gabin v. Skyline Cabana Club,* 54
*N.J.* 550, 555, 258 *A.*2d 6 (1969) to explain that "full effect should
be given, if possible, to every word of a statute."). The wholesale
adoption, as the equivalent of "humane," of "routine husbandry
practices," however, does precisely that.

Second, in light of the direct mandate to the Department to
adopt regulations that establish practices that are humane, the
decision by that agency to authorize an exemption, and therefore
to embrace wholesale any technique as long as it is "commonly
taught" at any of these institutions, under the circumstances, is an
impermissible subdelegation. As our Appellate Division has rec-
ognized, the "power . . . delegated by statute to an administrative
agency cannot be subdelegated in the absence of any indication
the Legislature so intends." *Mercer Council # 4 v. Alloway,* 119
*N.J.Super.* 94, 99, 290 *A.*2d 300 (App.Div.), *aff'd o.b.,* 61 *N.J.* 516,
296 *A.*2d 305 (1972). In fact, because of the nature of the entities
included within the safe harbor exemption, the Department did
not simply engage in a subdelegation, but did so in favor of some
entities that also might be described as private interests. *See
Remedial Educ. & Diagnostic Servs., Inc. v. Essex County Educ.
Servs. Comm'n,* 191 *N.J.Super.* 524, 527–28, 468 *A.*2d 253 (App.
Div.1983), *certif. denied,* 97 *N.J.* 601, 483 *A.*2d 139 (1984); *N.J.*

*Dep't of Transp. v. Brzoska,* 139 *N.J.Super.* 510, 512–14, 354 *A.*2d 650 (App.Div.1976).

We are not persuaded, in these circumstances, that the direction from the Legislature to the Department to work with the New Jersey Agricultural Experiment Station, *see N.J.S.A.* 4:22–16.1, is an indication that the Legislature intended that the agency would thereafter subdelegate its authority in so thorough a fashion. Although it might suggest that a limited subdelegation to that specific entity would be permitted, the Department went far beyond that narrow reading of the statute.

As an example, the Department could have reviewed the curriculum and faculty at a number of land grant colleges, universities, and veterinary schools and identified some where animal welfare concerns resulted in teaching of practices that meet the Department's definition of humane. Had it done so and had it then used those institutions as its safe harbor yardstick, there would be no basis for a challenge. Indeed, had the Department reviewed and relied on practices taught at Rutgers School of Environmental and Biological Sciences, formerly known as Cook College, and, perhaps, a veterinary school in New York or Pennsylvania, there would likely be no warrant for our interference. Instead, it accepted, without analysis, the practices that are taught in every veterinary school, land grant college, and agricultural extension agent not only in this state, but in the rest of the country and, it would appear, wherever they might be found around the globe. Although some of those institutions might teach or require practices that are far more humane than do our own, nothing in the record suggests that all of them will meet the standard set by our Legislature.

Our analysis of petitioners' objections to the several subsections of the regulations that create a safe harbor by reliance on "routine husbandry practices" compels us to conclude that these objections have merit. By adopting a definition of exceptional breadth, by failing to create an adequate record in support of this decision,

and by implicitly permitting techniques that cannot meet the statutory mandate to base its regulations on a determination about what is humane, the Department has adopted regulations that are arbitrary and capricious. We therefore strike as invalid the definition of "routine husbandry practices," *see N.J.A.C.* 2:8–1.2, and that part of each of the subsections of the regulations referring thereto, *see N.J.A.C.* 2:8–2.6(f), –3.6(f), –4.7(e), –5.7(e)(2), –6.6(d), –7.6(d).

## VII.

Petitioners also challenged individually a number of practices that are specifically permitted by the regulations, asserting that they are demonstrably inhumane and that the Department's authorization thereof is unsupported by sound science. In particular, petitioners point to several procedures utilized by some farming operations that are physically painful and, they contend, are emotionally distressing to the animals. At the same time, they argue, these same practices cannot be justified because they are often of little or no value. In response, the Department counters that there is ample scientific evidence in the record that supports the continued use of each of these procedures. Moreover, the Department asserts that because the regulations include limits on the manner and circumstances in which any of these disputed practices is permitted, the practical result is that each of them is only performed in a humane manner.

We address these specifically challenged practices in four groups, because the focus of the arguments is somewhat different as to each of the groups that we have identified. Within that framework, we also consider certain of the generally imposed limitations on the use and the manner of performance of these techniques to determine whether those limitations suffice to ensure that they are practiced in a humane manner.

This part of the challenge focuses on several practices that are

identified[14] in the regulations, as part of the safe harbor provisions or as otherwise permissible, and that therefore are presumptively humane. The challenged practices are: tail docking of cattle, *N.J.A.C.* 2:8–2.6(f); use of crates or tethering of swine, *see N.J.A.C.* 2:8–7.4(b)(2), cattle, *see N.J.A.C.* 2:8–2.4(g), and veal calves, *see N.J.A.C.* 2:8–2.4(h); castration (without required anesthesia) of cattle, *see N.J.A.C.* 2:8–2.6(f), horses, *see N.J.A.C.* 2:8–3.6(f), and swine, *see N.J.A.C.* 2:8–7.6(d); de-beaking of poultry, *see N.J.A.C.* 2:8–4.7(e); toe-trimming of turkeys (without required anesthesia), *N.J.A.C.* 2:8–4.7(f); and transporting sick and downed cattle to slaughter, *see N.J.A.C.* 2:8–2.2(b)(4)(iv).

## A.

The first specific practice that petitioners attack relates only to dairy cattle. This practice, known as "tail docking," *see N.J.A.C.* 2:8–2.6(f), is a procedure that involves "the amputation of the lower portion of a dairy cow's tail." Lawrence J. Hutchinson, *Tail Docking for Cattle* (1997). Petitioners contend that tail docking cannot meet the Department's definition of humane, and they point to evidence of a consensus among scientists that tail docking is without any "apparent animal health, welfare, or human health justification." *See* C.L. Stull et al., *Evaluation of the scientific justification for tail docking in dairy cattle*, 220 *J. Veterinary Med. Assoc.* 1298, 1302 (May 1, 2002).

They further assert that tail docking causes acute pain and interferes with the ability of the affected animals to perform natural behaviors, including flicking their tails to chase away flies

---

14 Petitioners also included in their brief an assertion that force-feeding of geese for the purpose of creating foie gras is not humane. They suggest that because the regulations do not specifically prohibit this practice, the regulations can be interpreted to permit a practice that is inhumane and are, therefore, defective. We perceive of this as an application to this Court to impose a ban on this particular practice, a request that would be inconsistent with the organizational structure of the statute and the regulations and, in our view, a request that is more properly within the province of the legislative branch.

in the summer. *See* S.D. Eicher & J.W. Dalley, *Indicators of Acute Pain and Fly Avoidance Behaviors in Holstein Calves Following Tail-docking*, 85 *J. Dairy Sci.* 2850 (2002). Moreover, petitioners note that both the American (AVMA) and Canadian (CVMA) Veterinary Medical Associations oppose tail docking of dairy cattle, and they point to the AVMA's position paper that states: "[c]urrent scientific literature indicates that routine tail docking provides no benefit to the animal, and that tail docking can lead to distress during fly seasons." *See* AVMA, *Animal Welfare Position Statements: Tail Docking of Cattle* (2005), *see also* CVMA, *Animal Welfare Position Statements: Tail Docking of Dairy Cattle* (2003). Petitioners argue that a practice from which the animal derives no benefit, and that will cause it to suffer distress, cannot be humane.

The Department contends that, despite the AVMA's position paper, its decision to permit tail docking to continue to be performed complied with its statutory mandate to create humane standards. The agency points out that it responded to comments objecting to the practice, and that it reasoned that the practice should be permitted because it may lead to better milk quality and udder health, and it may also reduce the spread of diseases. 36 *N.J.R.* 2652 (June 7, 2004).

Nonetheless, the agency also commented that because the science is inconclusive concerning whether these benefits will be achieved, *ibid.*, the Department "discourages" routine tail docking, leaving it to each producer to decide whether to engage in the practice. *Ibid.* In doing so, the agency points out that its position is consistent with that espoused by the American Association of Bovine Practitioners, and it assures this Court that it intends to monitor the effects of this procedure and that it will ban the practice in the future if it concludes that the procedure is cruel or inhumane.

Although we recognize the considerable expertise that the Department brought to bear in reaching its decision to include tail docking within its list of permitted practices, it is difficult to find

in this record any support for this particular practice, and none that meets the requisite standard of our review. The record amply demonstrates that, far from being humane, this practice is specifically disparaged by both the AVMA and the CVMA as having no benefit and as leading to distress. The only scientific evidence that even suggests that the practice might have some possible benefit is inconclusive at best.

■ More to the point, the record in support of the practice is so weak that even the industry trade group, like the Department, "discourages" it, leaving it apparently to the individual conscience of each dairy farmer. In light of the regulatory scheme, however, the practice was listed among those that are permitted and presumptively humane, *see N.J.A.C.* 2:8–2.6(f). The result is, therefore, to generally permit a practice for no apparent reason, and to permit it to be performed in accordance with no particular safeguards or standards, save for the Department's promise that it will ban tail docking in the future if it concludes that the practice is inhumane.

Apart from failing to adhere to the Legislative mandate that the agency permit only those practices that it finds to be humane (as opposed to not inhumane), because this practice finds no support at all in the record, to the extent that the regulation permits it, that aspect of the regulation is both arbitrary and capricious. In the absence of evidence in the record to support the practice or to confine it to circumstances in which it has a benefit and is performed in a manner that meets an objective definition of humane, this aspect of the regulation cannot stand.

### B.

For purposes of our analysis, we have identified several of the challenged practices that we find it appropriate to consider together. This group comprises three specific practices that are similar in terms of petitioners' focus and our evaluation of the record: (1) castration of swine, *N.J.A.C.* 2:8–7.6(d), horses, *N.J.A.C.* 2:8–3.6(f), and calves, *N.J.A.C.* 2:8–2.6(f); (2) de-beaking of chickens and

turkeys, *N.J.A.C.* 2:8–4.7(e); and (3) toe-trimming of turkeys, *N.J.A.C.* 2:8–4.7(f). Each is a procedure that petitioners assert is, by and large, unnecessary, because each seeks to prevent behaviors, or the effects thereof, in which animals would likely not engage were they not raised in close quarters. In addition, petitioners challenge these practices because each is performed without anesthetics, thus causing the animals significant, if not severe, pain.

As to each of these practices, the Department implicitly recognizes that there are sound animal husbandry and management reasons for raising livestock in relatively close quarters that it elects not to prohibit. In light of that largely philosophical viewpoint, the Department asserts that its review of the scientific and professional literature supports its conclusion that the specific practices provide benefits to the health and safety of livestock. Moreover, the Department points out that its regulations address the question of pain and do so by adding the limitation on use of each of these procedures, requiring that they be performed by "knowledgeable persons" who are required to "minimize pain." In this manner, the agency asserts that it has ensured that each procedure will be performed in a manner that is in fact humane.

It is apparent from the record that each of these specific practices is rather controversial. Part of that controversy, however, stems from the larger question of whether farm animals are to be raised in close quarters or in spacious and relatively unconfined surroundings. That philosophical debate about how farm animals are raised and kept in general cannot help but affect one's views about whether some of these procedures are, on the one hand, pointless and cruel, or on the other hand, necessary techniques for managing the livestock in one's care.

That debate about whether domestic livestock should be kept in close quarters or left relatively unconfined, however, is not addressed in the statute. Nothing in the statute suggests that the Legislature intended to embrace the latter and reject the former; the record instead reflects that the agency was charged with

finding an appropriate balance between the interests of animal welfare advocates and the need to foster and encourage agriculture in this state. Notwithstanding the ardent views of some of the individuals who have voiced opinions throughout the regulatory process, we do not view our role as including the right or the obligation to weigh in on that debate; we consider instead that it remains within the scope of the agency's expertise to strike a balance between the competing positions of the parties, guided only by the standards of review to which we have adverted.

The record reflects that there is evidence that demonstrates these practices confer a benefit on the animals in light of their living conditions. For example, castration is generally employed to reduce aggression between male animals, including horses and cattle, when they are kept together in a herd. *See, e.g.,* The European Commission, Scientific Committee on Animal Health and Animal Welfare, *The Welfare of Cattle Kept for Beef Production* 75 (April 25, 2001). Similarly, beak trimming is used to reduce such behaviors as cannibalism and pecking within a flock. *See, e.g.,* K. Keshavarz, *The Impact of Genetic Engineering on Plant Breeding,* 50 *Cornell Poultry Pointers* 9 (July 2000); Donald Bell et al., *Animal Care Series: Egg–Type Layer Flock Care Practices* 4 (1998). In a like manner, toe-trimming is performed to prevent turkeys from climbing on one another and causing injury and to prevent them from inflicting injury on their caregivers or handlers. *See, e.g.,* National Turkey Federation, *Animal Care Best Management Practices For the Production of Turkeys* (July 2004). Although there are other management techniques that might achieve the desired results without employing these particular methods, there is sufficient credible evidence in the record to support the agency's conclusion that these techniques can be performed in a humane manner and should be permitted.

Were the issue before this Court merely a matter of deciding whether the scientific evidence supports the use of the procedures at all, our task would be a simple one; were that our task, we would be constrained to conclude that there is sufficient evidence

in the record to support the Department's decision that they be permitted. That, however, is not the only question before this Court. Instead, the question is whether there is sufficient support in the record for the Department's decision to specifically permit these practices in the context of its mandate that it adopt regulations that will ensure that the treatment of animals is humane.

As to that more specific question, petitioners argue that the particular procedures cannot be humane if they are performed without the use of anesthetics or other pain management techniques. They point to literature suggesting that all of these procedures are painful, often greatly or severely so. *See, e.g.,* Tina Widowski & Stephanie Torrey, *Neonatal Management Practices* (2002) (explaining that castration is a painful procedure for piglets); *The Welfare of Cattle Kept for Beef Production, supra,* at 80 (concluding that "castration [of cattle] causes severe pain and distress"); AVMA Animal Welfare Committee, *Bird Welfare Positions Modified,* 220 *J. Am. Veterinary Med. Assoc.* 151 (Jan. 15, 2002) (reporting that removing a bird's beak with a metal blade causes "short-term" and "chronic" pain, as well as "acute stress"); I.J.H. Duncan, *Pain, fear and distress,* Global Conf. Animal Welfare Proc., Feb. 23–25, 2004, at 164–65 (concluding that performing toe-trimming on turkeys without anesthesia causes acute pain).

The Department responds by pointing out that there is scientific evidence that supports the conclusion that use of anesthesia in animals is often not recommended. Moreover, the agency notes that both de-beaking and toe-trimming are specifically limited by reference to the maximum age of the poultry on which these procedures may be performed, itself an effort to limit the consequential pain and distress that these procedures cause.

In addition, the Department asserts that the key to ensuring humane treatment of the animals rests on the requirement that all of these procedures be performed by an "appropriately trained person." For this reason, the agency notes that its regulations do not give broad permission for the use of any of these procedures,

but instead limit the practices in a significant way. Each such practice is permitted only if it is "performed in a sanitary manner by a knowledgeable individual and in such a way as to minimize pain." *See N.J.A.C.* 2:8–2.6(f) (castration of cattle), 2:8–3.6(f) (castration of horses), 2:8–7.6(d) (castration of swine); *N.J.A.C.* 2:8–4.7(e) (de-beaking of chickens and turkeys); *N.J.A.C.* 2:8–4.7(e) (toe-trimming of turkeys). Because of this limitation, the Department asserts that in practice the procedures will only be performed in a humane manner.

Our review of the record certainly supports the conclusion that the agency's determination, in general, that these procedures should be permitted is neither arbitrary nor capricious. We are, as part of this analysis, mindful of the significant limitations imposed relating to the age of the particular livestock on which some of these procedures may be performed, which we see as evidence of the agency's care in the decision-making process. Notwithstanding the foregoing, however, the limitation that the agency asserts is the lynchpin of ensuring that these procedures are performed in a humane manner cannot pass muster. The regulations do not define the terms "sanitary manner," "knowledgeable individual," or "minimize pain," nor is there any objective criteria against which to determine whether any particular individual performing the procedure measures up to these standards. As a result, the regulations that the Department suggests will ensure that the procedures will be accomplished in a humane manner provide no standard against which to test that they are in fact so performed. Although one farm may conclude that a knowledgeable individual, for example, means someone with either veterinary training or some similar level of expertise, another might conclude that merely having performed the procedure in the past, humanely or not, or merely having observed it being performed by others, humanely or not, meets the standard set forth in the regulations.

The lack of specificity in the regulations is illustrated by the Department's argument as set forth in its brief. There, notwith-

standing the actual language of the regulations, the agency describes the intent of the regulation to be that an "experienced handler with skill and knowledge" must perform the various procedures, rather than merely a knowledgeable one. Moreover, in the agency's brief, it asserts that because the person performing the procedure will be "experienced" and will have "skill and knowledge," he or she will be able to individually assess and evaluate each animal so as to perform the procedure humanely. In that context, the agency argues that the phrase "minimize pain" provides an objective standard that can be followed and enforced.

Our review compels a contrary conclusion. The agency's subtle rephrasing suggests that the language used in the regulation is insufficient and that only a different, and perhaps a significantly higher standard, would suffice. Perhaps that subtle rephrasing suggests the standard that the Department intended to include in the regulation. Had the Department, for example, defined "knowledgeable individual" in terms of having been taught at a course given by a particular institution, or having had the technique demonstrated by a veterinarian or an agricultural extension agent, or by use of similarly objective criteria, it would likely withstand our scrutiny. Indeed, in the context of the kinds of farming operations prevalent in this State, were the Department to conclude, based on an appropriate record, that there is sufficient support to include within the definition a set of objective criteria that would apply to individuals who have learned practices through others in their farming family, it might also be permissible. It is the failure to give meaning to the term that makes it fall short, rather than the sufficiency of a basis on which to choose to rely on such individuals.

Similarly, without any standard as to what the regulation means in terms of minimizing pain, there is no standard at all. One could, of course, conclude that each of these practices causes pain for a period of time, but that the benefits outweigh that adverse consequence. At the same time, one might conclude that, in light of the mandate of the Legislature that all of these practices be

performed only consistent with being humane, they can only be performed if sufficient pain medication or anesthesia is utilized. Alternatively, one might conclude that a particular practice is only humane if it is performed on an animal of a particular age or if a particular instrument is utilized. As it is, the Department adopted none of these standards.

The record reflects that the Department chose not to define the terms that form the basis for the inclusion of these practices as permissible and chose as well not to include specific requirements about the methods to use in performing these procedures. As such, however, this aspect of petitioners' challenge illustrates a significant flaw in this aspect of the regulations. Rather than creating a series of regulations that permit or disallow practices in accordance with whether they are humane, and rather than permitting practices only if performed in a specified manner, the agency instead authorized the practices in general and defined them as being humane by implicitly redefining humane itself. That is, the agency authorized the practices if performed by a knowledgeable person so as to minimize pain and equated that otherwise undefined person's choices with humane. This, however, has resulted in a regulation that is entirely circular in its logic, for it bases the definition of humane solely on the identity of the person performing the task, while creating the definition of that identity by using an undefined category of individuals of no discernable skill or experience.

Although it might be difficult to create a list of permitted practices with sufficient definition to ensure that they are in fact being performed humanely, the Legislature did not direct the Department to only do as much as it believed was expedient. We do not fault the Department for its decision not to attempt to create an exhaustive list of what is permitted and the precise circumstances that pertain. Nor do we dispute the Department's conclusion, as it is one that the Department is well-qualified to make, that these practices are beneficial to the animals or to the farmers. We do not suggest that these procedures cannot be

carried out in a manner that is, objectively, humane. In the absence of sufficient guidance in the regulations to ensure that the practices are being performed in a manner that is humane, however, they should not be included within the blanket permission granted in these subsections.

Moreover, by including these practices in the subsections of the regulations that authorize them to be performed, the Department has created an unworkable enforcement scheme. That is to say, there is no standard against which to judge whether a particular individual is "knowledgeable" or whether a method is "sanitary" in the context of an agricultural setting or whether the manner in which the procedure is being performed constitutes a "way as to minimize pain." That being the case, we are constrained to conclude that these aspects of the regulations fail to fix a standard that will ensure that the practices are in fact humane and, at the same time, are too vague to establish a standard that is enforceable.

### C.

Petitioners next attack the regulations relating to the use of crates and tethering for swine (sow gestation techniques) and for veal calves (cattle intended to be raised as "Special–Fed veal"), each of which they assert fails to meet the statutory standard of humane. In short, petitioners contend that these techniques do not permit the animals to move freely and to turn around and that they therefore cause significant distress in the animals not consistent with humane treatment. They rely on a number of publications relating to the use of crates for swine gestation that so conclude. *See, e.g.,* European Union, *Report of the Scientific Veterinary Committee, The Welfare of Intensively Kept Pigs,* ¶ 5.2.2, EU Doc XXIV/B3/ScVC/0005/1997, (Sept. 30, 1997) (*"The Welfare of Intensively Kept Pigs"*); J.L. Barnett, et al., *A review of the welfare issues for sows and piglets in relation to housing,* 52 *Austl. J. Agric. Res.* 1–28 (2001); J.N. Marchant et al., *The effects of housing on heart rate of gestating sows during specific*

*behaviours,* 55 *Applied Animal Behav. Sci.* 67, 75 (1997) (concluding that use of sow gestation crates likely causes cardiovascular disease). Petitioners further point out that this practice is banned in Florida, *see* Fla. Const. Art. X, § 21 (2005), and is currently being phased out and scheduled to be banned in member states of the European Union by 2013, *see European Union Council Directive 2000/88/EC of 23 October 2001.*

Petitioners refer to similar literature in support of their objections to the use of crates and tethering techniques for raising veal calves. They argue that this scientific evidence demonstrates that close confinement creates stress and causes the animals to engage in behaviors that demonstrate that they are in distress. *See, e.g.,* A.F. Fraser & D.M. Broom, *Farm Animal Behaviour and Welfare* (1997) (finding that confined calves often excessively groom and lick those portions of the body that are within reach and tongue-roll to excess); Ted H. Friend & Gisela R. Dellmeier, *Common Practices and Problems Related to Artificially Rearing Calves: An Ethological Analysis,* 20 *Applied Animal Behav. Sci.* 47–62 (1988) (concluding that confined calves exhibit increased motivation for locomotion and greater incidence of impaired locomotion ability, which can be accompanied by physiological changes indicative of stress); K.A. Cummins & C.J. Brunner, Alabama Agriculture Experiment Station, *Effect of Calf Housing on Plasma Ascorbate and Endocrine and Immune Function,* 74 *J. Dairy Sci.* 1582 (1991) (concluding that confined calves experience stress that weakens immune systems).

In response, the Department also points to an impressive array of scientific studies that, it asserts, support the regulations that permit the use of crating and tethering techniques, particularly as they relate to sows. *See, e.g., The Welfare of Intensively Kept Pigs, supra;* J.J. McGlone et al., *Review: Compilation of the Scientific Literature Comparing Housing Systems for Gestating Sows and Gilts Using Measures of Physiology, Behavior, Performance, and Health,* 20 *Prof. Animal Sci.* 105–06 (2004) (concluding that "gestation stalls (non-tethered) or well managed pens

generally (but not in all cases) produced similar states of welfare for pregnant gilts or sows in terms of physiology, behavior, performance and health"); J.L. Barnett et al., *A Review of the Welfare Issues for Sows and Piglets in Relation to Housing*, 52 *Austl. J. Agric. Res.* 1 (2001).

Although there are no veal farms in the State of New Jersey, as a result of which the challenge to the aspect of the regulation that would permit tethering or crates for their management is, perhaps, only theoretical, the Department also defends its decision to include permission for this technique in the regulations as well. In part, it does so by pointing out that the Legislature has twice declined to act on bills that would specifically require that veal calves be maintained in quarters that permit them to turn around completely, *see, e.g.,* Assembly Bill No. 1948 (introduced Feb. 28, 2002); Assembly Bill No. 329 (introduced Jan. 13, 2004), thus suggesting that the Legislature itself has considered this issue and spoken in a voice in full accord with the regulations.

In part, the agency relies on guidelines prepared and distributed by the American Veal Association (AVA). Those guidelines set forth four potential alternatives for housing veal calves, including the individual stall system that the regulations permit. The Department points out that the AVA Guide describes a number of sound reasons that support its decision to permit housing calves in individual stalls, including the reduced likelihood of disease passing among calves, a lessened possibility of fecal contamination, and greater ease in performing health examinations on the calves that result in less stress for the animals.

Our review of the literature relied on by the Department as compared with that cited by petitioners compels us to conclude that the agency's decision to permit these crating and tethering techniques, although controversial, falls well within its area of expertise. Moreover, the record demonstrates that the agency considered a wide variety of scientific and other studies before reaching its decision to include these particular management techniques within the regulations as permitted practices.

Far from simply adopting techniques already in place or embracing practices that serve only the economic ends of the agricultural community as petitioners suggest, these regulations reflect that the Department took seriously its mandate to identify humane practices, but did so in recognition of the need to balance those concerns with the interests of the farmers whose livelihood depends on such techniques and whose existence would be threatened were they to be banned. More to the point, because those aspects of the regulations are supported by sufficient credible evidence in the record, and because they are neither arbitrary nor capricious, we find no basis on which to interfere with them.

## D.

■ Finally, petitioners argue that the regulations permit the transport of sick and downed animals to slaughter, a practice that is not humane. They assert that because the regulations permit cattle with an extremely low BCS to be accepted for slaughter, by implication, their transport is also permitted. *See N.J.A.C.* 2:8–2.2(b)(4)(iv) (cattle with body condition score of 1.0 (emaciated) is permitted at slaughter). They contrast this with the prohibition on the transport of such animals to market, arguing that this makes the regulation arbitrary and capricious. Petitioners argue that because "downed" animals are unable to stand or walk on their own, the process of loading them onto transport trucks is inherently painful. *See, e.g.,* Temple Grandin, *Farm animal welfare during handling, transport, and slaughter,* 204 *J. Am. Veterinary Med. Assoc.* 372 (Feb. 1, 1994) (reporting that "[l]ess than 1% of the cattle handled and transported are downers, but these animals may suffer greatly").

In response, the Department suggests that petitioners have misinterpreted the regulation and have failed to consider the implication of federal law, *see* Federal Meat Inspection Act, 21 *U.S.C.A.* §§ 601–605; Federal Food, Drug, and Cosmetic Act, 21 *U.S.C.A.* §§ 301–399, that bears upon the slaughter of disabled cattle for use in the food chain. In light of those significant

limitations, the Department argues that a downed animal simply will not be transported for slaughter and that the only instance of a sick or downed animal being transported at all would, in all likelihood, involve taking it to a veterinarian for treatment.

Our review of the record reveals that the Department's reliance on the federal authorities does not completely address petitioners' concerns. As we understand it, the federal authorities on which the Department has relied are only designed to prevent downed animals from entering the food supply but do not otherwise prohibit them from being transported. The question thus remains whether the regulations, adopted by the Department, that permit their transport for slaughter can be sustained. This aspect of the regulations must be understood in its appropriate context.

The relevant regulations begin with a general requirement that sick or injured cattle must be treated or euthanized. *N.J.A.C.* 2:8–2.6(a). In fact, the regulation requires that treatment be "prompt" and that euthanasia be "humane." *Ibid.* The regulations specifically limit acceptable methods of euthanasia, incorporating by reference standards adopted by the AVMA. *See N.J.A.C.* 2:8–2.6(a)(1) (adopting and incorporating by reference AVMA, *2000 Report of the AVMA Panel on Euthanasia,* 218 *J. Am. Veterinary Med. Assoc.* 669 (Mar. 1, 2001)). Those standards include detailed information about acceptable methods as to each type of animal and about how each is performed. As a result, the options available to a farmer who needs to euthanize an animal are limited.

The regulations also include a subsection that governs downed cattle. These regulations, like their federal counterparts, prohibit transport to a livestock market, *N.J.A.C.* 2:8–2.6(a)(3)(vi), but do not prohibit transport for other purposes. *See N.J.A.C.* 2:8–2.6(a)(3)(i). However, the regulations specifically prohibit dragging such an animal while it is conscious, *N.J.A.C.* 2:8–2.6(a)(3)(ii), and require that it be treated humanely, even if it is going to be slaughtered or euthanized, *N.J.A.C.* 2:8–2.6(a)(3)(v).

During the notice and comment period, one commenter urged the Department to extend the prohibition on transport of downed cattle to livestock markets so that transport for slaughter would also be banned. 37 *N.J.R.* 2472 (July 5, 2005). The Department declined to do so, explaining that "[w]hile owners of downed animals may have the animal euthanized on the farm, the Department believes it is appropriate to provide some flexibility to owners on where and when slaughter may take place." *Ibid.* Although there is evidence in the record that a downed animal "may suffer greatly," *see* Grandin, *Farm animal welfare during handling, transport, and slaughter, supra,* at 372, in light of the strict limits on permitted euthanasia methods, we cannot conclude that the Department's decision to permit farmers the option of choosing transport for slaughter is arbitrary or capricious. We therefore perceive of no failure on the part of the agency in its decision to adopt this regulation that requires our intervention.

## VIII.

Our consideration of the issues raised in this appeal and our review of the record have led us to conclude that certain aspects of these regulations cannot be sustained. We do not intend, however, to suggest that the defects in the regulations are pervasive or that all of the many practices that the Department specifically considered and permitted cannot be performed in a humane manner. To be sure, we have concluded that the "routine husbandry practices" and the "knowledgeable individual and in such a way as to minimize pain" safe harbors cannot be sustained as written, but neither of these determinations effects a ban on any of the particular practices. Rather, any practice, technique, or procedure not otherwise prohibited by the regulations may be utilized by any farmer, risking only that the practice, technique, or procedure will be challenged by an appropriate enforcement authority as inhumane.

In such a proceeding, the burden of proving the facts, including that the particular practice as performed is inhumane, falls on the

enforcing authority. *See N.J.S.A.* 4:22–1 (establishing the NJSPCA "for the purpose of the enforcement of all laws enacted for the protection of dumb animals; ..."). In that context, some individuals utilizing some of these practices may be adjudged to have engaged in a practice that violates the animal cruelty statute, but others will not. *See N.J.S.A.* 4:22–17 (defining which acts and omissions constitute disorderly persons offenses and which are classified as third and fourth degree crimes); *N.J.S.A.* 4:22–26 (identifying which acts and omissions constitute animal cruelty punishable by civil fines and penalties).

Our decision, therefore, should not be understood to be a ban on the continuation of any specific practice, but merely a recognition that some of the standards that purport to define them so as to ensure that they are actually performed in a manner that meets the statute's command that all such practices be humane have fallen short.

### IX.

The facial challenge to the regulations in their entirety is rejected. The specific challenges to the reliance on "routine husbandry practices" as defined in the regulations, and to the reliance on "knowledgeable individual and in such a way as to minimize pain" are sustained. The specific challenges to the practices, with the exception of the practice of tail docking, are otherwise rejected.

The judgment of the Appellate Division is affirmed in part and reversed in part and the matter is remanded to the Department for further proceedings consistent with this opinion.

*For affirmance in part/reversal in part/remandment*—Chief Justice RABNER and Justices LONG, LaVECCHIA, ALBIN, WALLACE, RIVERA–SOTO and HOENS—7.

*Opposed*—None.