709 A.2d 192

DELAWARE BAY WATERMAN'S ASSOCIATION OF NEW JERSEY, A NON–PROFIT CORPORATION, CHARLES F. BURKE, JR., JOHN KING, FRED LAYTON, JR., KENNETH W. BAILEY, ROBERT BATEMAN, JAMES J. NASH, JEFFREY W. NACE, ALEXANDER T. OGDEN, III AND LANCE NAYLOR, APPELLANTS–RESPONDENTS, v. NEW JERSEY DEPARTMENT OF ENVIRONMENTAL PROTECTION, RESPONDENT–APPELLANT.

Argued February 18, 1998—Decided April 7, 1998.

*Jaynee LaVecchia,* Assistant Attorney General, argued the cause for appellant (*Peter Verniero,* Attorney General of New Jersey, attorney; *Ms. LaVecchia* and *Joseph L. Yannotti,* Assistant Attorney General, of counsel; *Howard L. Geduldig, Catherine A. Tormey* and *Judeth Piccinini Yeany,* Deputy Attorneys General, on the briefs).

*Richard M. Hluchan,* argued the cause for respondents (*Levin & Hluchan,* attorneys; *Richard S. Morrison,* on the brief).

Senator *James S. Cafiero,* Assemblyman *Nicholas Asselta* and Assemblyman *John C. Gibson,* submitted a brief on behalf of *amici curiae pro se.*

PER CURIAM.

This appeal concerns a ban on the harvesting of horseshoe crabs imposed by the New Jersey Department of Environmental Protection (DEP) on July 29, 1997. This ungainly creature is one of nature's marvels.

> Ugliness is nature's great gift to the horseshoe crab. It looks like a cross between a lobster and a Sherman tank, with a steel helmet of a shell and enough barbs and spikes to deter most predators. Get past the armor and there's little to eat; fishermen long viewed the crabs as a nuisance, barely worth the few pennies they'd fetch at the fertilizer plant.
>
> This singular unattractiveness, wrapped in a remarkably sturdy biological package, enabled the crab to survive for 300 million years. Ice ages and meteor explosions that wiped out dinosaurs rolled off its armor-plated back.
>
> [Joby Warrick, *Ugly Horseshoe Crab May Have a Future to Match on Delaware Bay, Washington Post,* Aug. 4, 1997, at A3.]

Despite the crab's durability, humankind today poses a serious threat to the survival of the horseshoe crab.

> Fishermen have discovered a market for the crabs as bait for a growing eel fishery, and suddenly one of [the] ocean's great survivors is floundering. In the Delaware Bay, home of the largest concentration of Atlantic horseshoe crabs, its numbers on some beaches are down 90 percent in five years.

The drop is coinciding with a new awareness of the creature's ecological value. In the bay, fewer horseshoe crabs means fewer horseshoe crab eggs, a dietary staple for migratory shore birds that flock to local beaches each spring[,] ... [endangering] the $30 million-a-year bird-watching industry that has grown up around it. "You pull at one thread," observes [the] ... refuge manager for Cape May National Park, "and everything starts to come undone."

. . . .

Ironically, the crab is becoming imperiled just as scientists are fully realizing its potential for improving human health. The horseshoe crab's unique blue blood is the world's only source of a compound called limulus amoebocyte lysate, which is used widely to test for bacterial contaminants in drugs. The nearly pure form of a substance in the crab's shell—chitin—is being explored as a possible dressing for burns that promotes faster healing.

[*Ibid.*]

The DEP's action took the form of an emergency rule regulating the commercial harvesting of horseshoe crabs, *N.J.A.C.* 7:25–18.16. The effect of the July 29, 1997 rule was to create a sixty-day extension to a complete ban on the taking of horseshoe crabs imposed by a prior emergency rule adopted sixty days earlier, on May 30, 1997. The July emergency rule completely banned the taking of horseshoe crabs until May 1, 1998. In addition, the emergency rule eliminated a previously existing, year-long horseshoe crab harvest allowing, instead, horseshoe crabs to be taken by hand on two days per week in May and June to the extent of one hundred crabs per person, per day. Trawling for crabs was prohibited.

Plaintiff, Delaware Bay Waterman's Association (DBWA), represents individuals engaged in the harvesting and taking of horseshoe crabs for commercial gain. DBWA contended that the July 29, 1997 emergency rule was the functional equivalent of the May emergency rule and impermissibly extended the May emergency regulation for an additional sixty days. It contended that DEP adopted the emergency rule in violation of section 4(c) of the Administrative Procedure Act (APA), *N.J.S.A.* 52:14B–4(c), which provides that an emergency rule or regulation may be effective for a period of not more than sixty days, unless each house of the Legislature passes a resolution concurring in its extension for a

period of not more than sixty days. Neither house passed such a resolution. DBWA contended that DEP's failure to comply with the APA requirement rendered the July rule invalid.

On August 14, 1997, DBWA sought, in the Appellate Division, a temporary stay of the July 29, 1997 emergency rule. Following a hearing on the stay application, the Appellate Division concluded that because of the fleeting nature of the issues, the court had to accelerate the substantive appeal. 304 *N.J.Super.* 20, 23–24, 697 *A.*2d 957 (1997). On August 20, 1997, the Appellate Division invalidated the ban, finding that the emergency regulation violated section 4(c) because DEP had failed to obtain the necessary approval of both houses of the Legislature. *Id.* at 25, 697 *A.*2d 957.

DEP sought a stay of the Appellate Division's decision pending certification in and further order of this Court. On September 4, 1997, we granted DEP's petition for certification, 151 *N.J.* 469, 700 *A.*2d 881 (1997), and stayed the Appellate Division's judgment. DBWA sought expedited consideration of this matter or, in the alternative, to vacate the stay of the judgment of the Appellate Division. DBWA's motion was denied. The net effect of the Supreme Court actions was that the emergency ban on harvesting of horseshoe crabs remained in place for an additional sixty days until it would expire by its own terms on September 27, 1997.

Concurrently with its adoption of the emergency regulation on July 29, 1997, DEP proposed a permanent regulation for the harvesting of horseshoe crabs. Following notice and opportunity to be heard, DEP adopted the permanent rule on September 25, 1997. Provisions of the new regulation reduce the harvesting season to two months a year, eliminate trawling or dredging as a means of harvest, and limit hand-harvest during the two-month season to two days a week. *N.J.A.C.* 7:25–18.16.

▪■ Following the adoption of the permanent rule, with some matters reserved, DEP moved to dismiss this appeal on grounds of mootness and to vacate the August 20, 1997 judgment of the

Appellate Division. We reserved decision on that motion pending argument of the appeal before us. DBWA opposed the grant of the motion reasoning that the issue before the Court was one of significant public policy that was likely to occur again and would evade review in the future. The Appellate Division had recognized that "in light of the normal length of time required for the appellate process, the dispositive issue here could forever evade review." 304 *N.J.Super.* at 23–24, 697 *A.*2d 957. Because an emergency regulation may be in effect for only sixty days, the time period may be insufficient in the normal course for a challenge to the back-to-back adoption of emergency rules to work its way through the courts to the Supreme Court.

At oral argument, the parties were in agreement on the substantive principle of law involved, namely that an executive agency of government may not adopt, without the concurrence of the Legislature, back-to-back emergency regulations in excess of sixty days. The point on which the parties differed was whether the two emergency regulations, the May 1997 regulation and the July 1997 regulation, were, in fact, the same. DEP contended that there were two separate emergencies and two distinct rules. It described the first rule as the "Shorebird Emergency Rule." It argued that by the spring of 1997 a potential shortage in eggs deposited by horseshoe crabs on the shores of the Delaware Bay threatened the food sources needed to replenish the energy reserves of migratory shore birds making a seasonal stop in New Jersey. The May regulation was adopted in response to this emergency. The rule was designed to put a halt to further crab harvesting that would interfere with the shore birds' ability to feed while traveling on their migratory path.

Further studies conducted by DEP between May and the end of July disclosed a much greater concern than that for the shore birds. The data indicated a serious decline in horseshoe crab population. DEP determined that the resumption of trawling and dredging for horseshoe crabs would have a devastating effect on both the species itself and the horseshoe crab fishery. The

horseshoe crab commercial fishery provides bait for other fisheries and also serves as the sole source for a chemical compound derivative of horseshoe crab blood that is used in the detection and elimination of bacterial toxins in the treatment of diseases such as spinal meningitis. In response to what it perceived to be a new threat to the horseshoe crab fishery itself, DEP prepared a proposal for a permanent rule amending the horseshoe crab harvesting regulations. It feared otherwise a complete depletion of the horseshoe crab population.

DBWA contended that these were not two distinct emergencies; it was always one emergency, a shortage of horseshoe crabs. DEP had ample opportunity to seek a legislative extension of the May Shorebird Emergency Rule rather than promulgating a second emergency rule. DEP explained, however, that it could not have obtained a legislative extension of the July rule because it could not extend, by resolution of both houses, an emergency rule that was significantly different in purpose and intent from the earlier emergency rule. DEP argues that the Legislature would never have intended that the APA tie the hands of government to respond to emergency circumstances not foreseen at the time of the adoption of an earlier administrative emergency regulation. DEP agrees, however, that it cannot make the same emergency into a different emergency simply by saying it is so. An agency of state government may not, by the pretextual declaration that an emergency is new, extend its statutory authority to circumvent a sixty-day limit on emergency regulations.

■ The Appellate Division found that

the two separate emergency amendments have the same cause, namely the shortage of horseshoe crabs, and the same result, namely the total ban on the taking of horseshoe crabs. While the DEP offered two different reasons for the two emergency amendments, we find that the same cause and the same result makes for the same emergency. The fact that the DEP can articulate different reasons for the two amendments does not make them sufficiently different to treat them as two separate emergencies.

[304 *N.J.Super.* at 24–25, 697 *A.2d* 957.]

Although the principle appears correct in the abstract, it may prove to be incorrect in the concrete circumstances that often

confront government. To take the argument to an extreme: If use of an insecticide were banned for sixty days because of a possible effect on wildlife, and intervening research disclosed that the product posed a profound danger to human health, we doubt that the Legislature intended that the agency not be allowed to respond to the new emergency. We thus agree with DEP that if there is a genuinely distinct and separate emergency, even if a second regulation has the same effect on the regulated public (such as the ban on the insecticide), the agency is not precluded from responding to the emergency with a sixty-day regulation.

Although, then, the parties might disagree as to whether on this record there was one emergency or two, all are in agreement that when there are two distinct and separate emergencies the APA confers extraordinary powers on the executive branch to deal with the circumstances. Although that authority is to be used only in appropriate circumstances, its exercise must not be so circumscribed as to prevent a proper response by an agency head and the Governor when such distinct emergent circumstances present themselves. What is in dispute in this case is whether there were, in fact, two distinct and separate emergencies. There is no longer any need in this case to debate what was essentially a factual issue. Nor is there any need to vacate the judgment of the Appellate Division that, correctly understood, reflects an attempt to determine, in a limited period of time, whether the factual record sustained a finding that there were two separate emergencies or one emergency. The law being clear, we agree with DEP that the case is moot and does not require us to decide whether we might or might not agree with the Appellate Division's assessment of this record.

The appeal is dismissed as moot.

*For dismissal*—Chief Justice PORITZ and Justices HANDLER, POLLOCK, O'HERN, GARIBALDI, STEIN and COLEMAN—7.

*Opposed*—None.