NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1019-22

ANIMAL PROTECTION LEAGUE
OF NEW JERSEY, ANGELA
METLER, and DOREEN FREGA,

      Appellants,

v.

NEW JERSEY FISH AND GAME
COUNCIL, FRANK VIRGILIO,
in his capacity as Chair of the New
Jersey Fish and Game Council,
NEW JERSEY DEPARTMENT OF
ENVIRONMENTAL PROTECTION,
SHAWN M. LATOURETTE, in his
capacity as Commissioner of the
Department of Environmental
Protection, and PHILIP D.
MURPHY, in his capacity as
Governor of the State of New Jersey,

      Respondents.

_____

APPROVED FOR PUBLICATION

November 6, 2023

APPELLATE DIVISION

Argued October 3, 2023 – Decided November 6, 2023

Before Judges Sumners, Rose and Perez Friscia.

On appeal from the New Jersey Department of Environmental Protection.

Dante DiPirro and Doris Lin argued the cause for appellants (Law Office of Dante DiPirro, LLC, and

Doris Lin, attorneys; Dante DiPirro and Doris Lin, on the briefs).

Cristin D. Mustillo, Deputy Attorney General, argued the cause for respondents (Matthew J. Platkin, Attorney General, attorney; Sookie Bae-Park, Assistant Attorney General, of counsel; Nicolas G. Seminoff, Deputy Attorney General, and Cristin D. Mustillo, on the brief).

The opinion of the court was delivered by

ROSE, J.A.D.

The history of our state's black bear hunt is as controversial as it is lengthy. See, e.g., U.S. Sportsmen's All. Found. v. N.J. Dep't of Env't Prot., 182 N.J. 461 (2005). The sole issue presented on this appeal is the validity of the emergency rule that precipitated the December 2022 hunt.

On November 15, 2022, the State authorized the adoption of a new Comprehensive Black Bear (Ursus americanus) Management Policy (CBBMP) and related amendments to the State Fish and Game Code (Game Code), N.J.A.C. 7:25-5.1 to -5.39, pursuant to its emergency rulemaking authority under the Administrative Procedure Act (APA), N.J.S.A. 52:14B-1 to -15, thereby permitting a two-week black bear hunt that was scheduled to commence three weeks later on December 5, 2022. The emergency rule was approved by respondents New Jersey Fish and Game Council (Council); Council Chairman Frank Virgilio; New Jersey Department of Environmental Protection (DEP);

DEP Commissioner Shawn M. LaTourette; and Governor Philip D. Murphy.

On November 30, 2022, we granted the emergent application of appellants Animal Protection League of New Jersey (APLNJ), Humane Society of the United States, Friends of Animals,[1] Angela Metler, and Doreen Frega to move for a stay of the November 15, 2022 concurrent emergency rule and proposed 2022 CBBMP. We temporarily stayed the hunt while we considered appellants' application. On December 5, 2022, we denied appellants' motion and lifted the stay.[2]

The Supreme Court denied appellants' ensuing emergent application to stay the hunt pending appeal. In a December 7, 2022 order, the Court explained:

> In denying the emergent application for a stay, the Court at this time takes no position on, and does not approve of the use of, the emergency rulemaking process here. In past years, the . . . Council has adopted [CBBMPs] that authorized black bear hunts after public notice and comment, and those policies have led to legal challenges. Appellants' appeal can proceed in the Appellate Division, which will address the merits of appellants' arguments relating to the use of emergency

---

[1] Pursuant to appellants' February 9, 2023 amended notice of appeal, the Humane Society of the United States and Friends of Animals withdrew their participation in this appeal.

[2] While appellants' application was pending, respondents filed an emergent application to lift the stay. We denied the application and the Court thereafter denied respondents' application that sought emergent relief from our interim stay.

3                                                                    A-1019-22

rulemaking in this matter. We request that this appeal be expedited.

On March 30, 2023, we granted, in part, appellants' motion to supplement the record to include the complete transcript of the November 15, 2022 proceedings and various scientific and administrative materials. On that same day, we denied respondents' motion for summary disposition. Citing the court's authority to resolve appeals concerning "important matter[s] of public interest," Reilly v. AAA Mid-Atl. Ins. Co. of N.J., 194 N.J. 474, 484 (2008), or matters that are "likely to reoccur but capable of evading review," Zirger v. Gen. Accident Ins. Co., 144 N.J. 327, 330 (1996), we rejected respondents' argument that the present appeal was moot because the emergency rule expired on January 14, 2023. We also noted the Court's request that we expedite the appeal on the merits.

We now address the merits of appellants' arguments. Appellants challenge the validity of the emergency rulemaking on five bases, contending: (1) respondents failed to comply with certain requirements set forth in section 52:14B-4(c) of the APA; (2) respondents failed to comply with the Court's holding in Sportsmen's Alliance, mandating the DEP approve the CBBMP before the Council can authorize a hunt; (3) the emergency rulemaking caused, and threatened to continue to cause, significant harm; (4) the CBBMP enacted

4

in conjunction with the rulemaking failed to satisfy the requirements set forth in N.J.S.A. 13:1B-28 and Sportsmen's Alliance; and (5) the CBBMP is arbitrary and capricious.

Respondents counter there existed substantial credible evidence in the record to support the emergency rule "to control the burgeoning bear population and to abate the alarming increase in dangerous human-bear interactions." Maintaining the emergency rule comported with the APA, respondents urge us to defer to their decisions.

Because we conclude the State violated the emergency rulemaking requirements under section N.J.S.A. 52:14B-4(c) of the APA, both by failing to demonstrate enactment of the rule was necessary on fewer than thirty days' notice and the hunt was necessary to avert imminent peril, we reverse. Accordingly, we decline to consider appellants' remaining contentions.

I.

Recent History of the Black Bear Hunt

To provide context to the issues raised on appeal, we commence our review with a brief discussion of the Council's statutory authority and the recent history of the state-sanctioned black bear hunts. Pursuant to N.J.S.A. 13:1B-30, the Council is authorized, in pertinent part, "to determine under what

circumstances . . . by what means and in what amounts and numbers . . . game animals[] and fur-bearing animals . . . may be pursued, taken, killed, or had in possession . . . to maintain an adequate and proper supply thereof." The statute empowers the Council to adopt and amend the Game Code "to preserve, properly utilize[,] or maintain the best relative number of any [such] species or variety thereof." Ibid. The Game Code, in turn, permits the State to conduct an annual bear hunt, provided – as a condition precedent – a CBBMP "has been approved by the Council and [DEP] Commissioner and adopted pursuant to the [APA]." N.J.A.C. 7:25-5.6; see also Sportsmen's All., 182 N.J. at 476.

In Sportsmen's Alliance, our Supreme Court held the "Council's ability to authorize a bear hunt is subject to the statutory condition precedent of the Commissioner's earlier approval of the very comprehensive policies governing the propagation of black bears." 182 N.J. at 476; see also N.J.S.A. 13:1B-28 (limiting the Council's power to "formulate comprehensive polices for the protection and propagation of . . . game animals"). The Court explained these comprehensive policies should include "broad preservation goals . . . , the tools at the . . . Council's disposal to accomplish those goals, and most importantly, the factors that should be considered when determining which tools will be utilized." Sportsmen's All., 182 N.J. at 478. Further, a CBBMP must be

"adopted as a rule," in accordance with the requirements of the APA, and will be deemed "invalid" if its adoption "fail[ed] to follow APA procedures." N.J. Animal Rts. All. v. N.J. Dep't of Env't Prot., 396 N.J. Super. 358, 372 (App. Div. 2007).

The Game Code provides specific terms for the hunt including the season dates and methods of harvest. N.J.A.C. 7:25-5.6. Relevant here, N.J.A.C. 7:25-5.6 provides two hunting segments: Segment A beginning on the second Monday in October, and Segment B concurrent with the firearm deer season, typically occurring in December.

Operating under the auspices of the DEP, the Council adopted a CBBMP in 2015 (2015 CBBMP), with an expiration date of June 12, 2021. Thus, the black bear hunt was authorized through the end of the second 2020 hunting segment. Notwithstanding the existence of the 2015 CBBMP, the hunt was suspended on state lands in August 2018 by Governor Murphy's Executive Order No. 34 "to evaluate the feasibility of exclusively using non-lethal measures" and "maintain the population in a manner that is protective of the public's safety." Under the 2015 CBBMP, the hunt continued on private lands during the designated segments through 2020.

A-1019-22

In March 2021, three months prior to the 2015 CBBMP's expiration date, the Council considered a new CBBMP (2021 CBBMP), which recommended a black bear hunt through formal rulemaking under the APA. For reasons that are unclear from the record, the proposed 2021 CBBMP was not adopted at that time.

Later that year, however, during its regular meeting held on September 14, 2021, the Council voted to advance an emergency rule and concurrent proposal to adopt the 2021 CBBMP, as updated, to address the state's black bear population management. Chairman Virgilio noted "the [C]ouncil was not at odds with the policy" espoused by "the Governor and Commissioner[']s Office." The Council cited unspecified "data, the best available science, the lack of an approved CBBMP and bear hunt" and an ongoing concern for public safety in support of the emergency rule.

The record is unclear, but either Governor Murphy or Commissioner LaTourette did not concur with the Council's finding of imminent peril. Because the Council was unable to proceed with emergency rulemaking, the black bear hunt did not occur in 2021. See N.J.S.A. 52:14B-4(c) (requiring both the agency and the governor to concur in the finding of imminent peril).

II.

The November 15, 2022 Emergency Rulemaking

With that recent history in view, we consider the emergency rulemaking at issue. In a November 10, 2022 notice posted on its website, the Council stated its intention to consider measures to reintroduce the black bear hunt during its regular meeting, which was scheduled five days later on November 15. Describing a growing black bear population despite the agency's non-lethal efforts to manage the population following the 2018 suspension of the hunt on state lands, the Council advised public safety required "immediate action." The Council thus announced its intention to effectuate a hunt through emergency rulemaking, including the adoption of the 2022 CBBMP and related Game Code amendments. Copies of these proposals were neither contained in, nor attached to, the notice. By adopting the 2022 CBBMP via emergency rulemaking, the condition precedent for a hunt would be satisfied, enabling the Council to schedule a hunt from December 5 to December 10, 2022, under the Game Code's Segment B. See N.J.S.A. 7:25-5.6(a). The public was invited to offer comments in person.

During the Council's November 15, 2022 meeting, Assistant DEP Commissioner David Golden reported the closure of state lands to bear hunting

under Governor Murphy's 2018 Executive Order No. 34 caused a reduction in harvest rates and an increase in the bear population. Despite the utilization of non-lethal methods, there existed a "high level" of human-bear interactions due to the growing bear population. According to Golden, "the updated scientific literature" indicated there were no reasonable fertility control techniques for black bears and the Council's "population reconstruction model" projected the state's black bear population would increase to approximately 4,000 by 2024. Opining "the more bears you have, the more likely you're setting yourselves up for a potentially dangerous bear-human interaction," Golden concluded "there was a situation of imminent peril in New Jersey right now."

Golden acknowledged that other than "some minor editorial changes," the proposed 2022 CBBMP was "the same" as the rejected 2021 CBBMP. Both CBBMPs shared "all of the objectives, all of the figures, and really, most of the content, but for some minor editorial changes." Those changes included the revision of the date of the 2021 CBBMP to reflect the current year.

Citing "[t]he need for a new CBBMP that include[d] lethal management as part of the range of measures available to the Council," the emergency rulemaking proposal listed statistics regarding black bear encounters with other animals and humans, and damage caused to property. To support the proposal,

10

the Council cited, among other reasons:  damage reports that reflected a 237% increase in bear damage and nuisance reports from January 2022 to October 2022; the death of a young man in 2014 "during an aggressive interaction with a bear on public open space"; the failure of the DEP's non-lethal management techniques during the two prior years; the detrimental impact on agriculture; and the need for "a regulated hunt in December 2022 to offset population increases expected in the spring of 2023," when the bears ceased hibernating.

The emergency rulemaking proposal included amendments to the Game Code, N.J.A.C. 7:25-5.6.  Those amendments set forth restrictions on harvesting small cubs weighing less than seventy-five pounds and harvesting adult bears accompanying such cubs.  The amendments also prohibited the taking of black bears within 300 feet of a baited area.

The proposed 2022 CBBMP provided an extensive summary of the status and history of black bears in New Jersey, noting 3,158 black bears inhabited the state in 2020 and the hunt has been a viable tool for managing the black bear population since 1980.  The 2022 CBBMP thus recommended a hunt to manage the black bear population on public lands.

Golden summarized the recommendations for emergency rulemaking, including the proposed 2022 CBBMP and its recommendation for a hunt, and

the amendments to the Game Code, with promulgation as both an emergency rule and concurrent rulemaking proposal.[3] Following discussion among the Council members, at least thirty-eight members of the public provided comments. Those members included appellants Metler and Frega on behalf of APLNJ. At the conclusion of the meeting, the Council voted to approve the 2022 CBBMP and the amendments to the Game Code, each as emergency rules and concurrent rulemaking proposals.

Absent from the transcript of the November 15 meeting is any indication the Council considered or approved an explicit statement of imminent peril. Instead, after the vote, Golden indicated the Council's staff "will work on" the proposal, and the "required signatures" would be obtained "as quickly as possible." Notably, however, the transcript of the September 14, 2021 meeting reflects the Council adopted a statement of imminent peril during that meeting.

---

[3] The concurrent rulemaking proposal was subject to the non-emergency notice and comment requirements of the APA, N.J.S.A. 52:14B-4(a). Pursuant to N.J.A.C. 1:30-6.5(d), an agency may prepare a "concurrent notice of proposal" to continue the provisions of an emergency rule beyond the statutory sixty-day period of emergency, subject to the formal rulemaking requirements set forth in the APA. On September 7, 2023, the 2022 CBBMP and amendments to the Game Code rule were adopted pursuant to formal rulemaking by the Council and published in the New Jersey Register on October 2, 2023. 55 N.J.R. 2056(a) (Oct. 2, 2023). That rulemaking is not at issue on this appeal.

Later that same day, Chairman Virgilio signed a "Statement of Imminent Peril to the Public Health, Safety, and Welfare Mandating Adoption of Amendments to the Game Code and Adoption of the Comprehensive Black Bear Management Policy." The Statement recited the growth in the black bear population and the resulting increased number of damage and nuisance reports, as described in Golden's presentation. The Statement outlined the non-lethal management methods Golden described and concluded the state's black bear population continued to grow despite those efforts.

According to the Statement, a regulated hunting season would reduce the number of bears in the state, concomitantly reducing the likelihood of life-threatening human-bear interactions. Thus, the immediate action to implement a December hunt was the only reasonable way to limit the population growth before the next cycle of propagation in early 2023. The Statement concluded an imminent peril existed to the safety, health, and welfare of the citizens of this state, justifying the adoption of the 2022 CBBMP and amendments to the Game Code as emergency regulations pursuant to N.J.S.A. 52:14B-4(c). Later the same day, Commissioner LaTourette executed an administrative order confirming the hunt could occur on state lands.

Governor Murphy, in turn, issued a "Certification of Imminent Peril," concurring with the Council's finding of imminent peril and authorizing the emergency adoption of the rule. Also on November 15, Governor Murphy issued Executive Order No. 310, rescinding Executive Order No. 34, thus permitting the hunt on state lands.

Thereafter, the emergency rule and concurrent proposal were filed with the Office of Administrative Law. They were published in the New Jersey Register on December 5, 2022. 54 N.J.R. 2205(a) (Dec. 5, 2022).

III.

The APA's Formal and Emergency Rulemaking Requirements

Against that procedural posture, we turn to the APA's formal and emergency rulemaking requirements. Administrative agencies possess wide latitude in selecting the appropriate procedures to effectuate their regulatory duties and statutory goals. See Metromedia, Inc. v. Dir., Div. of Tax'n, 97 N.J. 313, 333 (1984). However, this flexibility does not permit an agency to ignore the APA's requirements for proposing and issuing regulations. See St. Barnabas Med. Ctr. v. N.J. Hosp. Rate Setting Comm'n, 250 N.J. Super. 132, 142 (App. Div. 1991); see also Metromedia, 97 N.J. at 334 (recognizing an agency's discretion in selecting a suitable procedure to achieve its regulatory

arm is not unlimited). A rule not adopted in "substantial compliance" with the requirements of the APA is invalid. N.J.S.A. 52:14B-4(d).

Public participation in agency rulemaking is the APA's "primary goal." See Bd. of Educ. of City of Plainfield v. Cooperman, 209 N.J. Super. 174, 202 (App. Div. 1986). Formal rulemaking allows the agency to "further the policy goals of legislation by developing coherent and rational codes of conduct 'so those concerned may know in advance all the rules of the game, so to speak, and may act with reasonable assurance.'" Gen. Assembly of N.J. v. Byrne, 90 N.J. 376, 385-86 (1982) (quoting Boller Beverages, Inc. v. Davis, 38 N.J. 138, 152 (1962)). "The purpose of the APA rulemaking procedures is 'to give those affected by the proposed rule an opportunity to participate in the process, both to ensure fairness and also to inform regulators of consequences which they may not have anticipated.'" In re Provision of Basic Generation Serv., 205 N.J. 339, 349 (2011) (quoting In re Adoption of 2003 Low Income Hous. Tax Credit Qualified Allocation Plan, 369 N.J. Super. 2, 43 (App. Div. 2004)).

Under the APA's procedures for formal rulemaking, an agency must meet certain requirements before it may adopt, amend, or repeal a rule. See Shapiro v. Albanese, 194 N.J. Super. 418, 431 (App. Div. 1984). Those requirements include: affording the public at least thirty days' notice of the proposed change;

publicly distributing a summary of the proposed rule; giving interested parties at least thirty days to submit written and oral comments; reviewing the public comments; conducting a public hearing on the proposed rule under certain circumstances; providing fifteen days' notice prior to the hearing; and preparing a summary of comments received for public distribution.  N.J.S.A. 52:14B-4(a).

By contrast, emergency rulemaking is subject to more stringent requirements as set forth in N.J.S.A. 52:14B-4(c):

> If an agency finds that an imminent peril to the public health, safety, or welfare requires adoption of a rule upon fewer than 30 days' notice and states in writing its reasons for that finding, and the Governor concurs in writing that an imminent peril exists, the agency may proceed to adopt the rule without prior notice or hearing, or upon any abbreviated notice and hearing that it finds practicable.  The agency shall publish, on its Internet website, a summary of any rule adopted pursuant to this subsection, and the statement of reasons for the agency's finding that an imminent peril exists.  Any rule adopted pursuant to this subsection shall be effective for a period of not more than 60 days, unless each house of the Legislature passes a resolution concurring in its extension for a period of not more than 60 additional days.  The rule shall not be effective for more than 120 days unless repromulgated in accordance with normal rule-making procedures.

See also N.J.A.C. 1:30-6.5 (codifying the specific procedures for emergency rulemaking).

Our standard of review of an agency's rulemaking under the APA is well settled. "Courts afford an agency 'great deference' in reviewing its 'interpretation of statutes within its scope of authority and its adoption of rules implementing' the laws for which it is responsible." N.J. Ass'n of Sch. Adm'rs v. Schundler, 211 N.J. 535, 549 (2012) (quoting N.J. Soc'y for Prevention of Cruelty to Animals v. N.J. Dep't of Agric., 196 N.J. 366, 385 (2008)). This deference "stems from the recognition that agencies have the specialized expertise necessary to enact regulations dealing with technical matters and are 'particularly well equipped to read and understand the massive documents and to evaluate the factual and technical issues that . . . rulemaking would invite.'" N.J. State League of Muns. v. Dep't of Cmty. Affs., 158 N.J. 211, 222 (1999) (quoting Bergen Pines Cnty. Hosp. v. N.J. Dep't of Hum. Servs., 96 N.J. 456, 474 (1984)); see also In re Election L. Enf't Comm'n Advisory Op. No. 01-2008, 201 N.J. 254, 262 (2010). Thus, an agency's regulations are presumed "valid and reasonable." N.J. Soc'y for Prevention of Cruelty to Animals, 196 N.J. at 385.

We may not, however, abdicate our "function to assure that agency rulemaking conforms with basic tenets of due process, and provides standards to guide both the regulator and the regulated." Id. at 386 (quoting Lower Main

St. Assocs. v. N.J. Hous. & Mortg. Fin. Agency, 114 N.J. 226, 236 (1989)).  In assessing a regulation's validity, we therefore must consider whether the administrative agency complied with the APA's provisions "and due process requirements."  In re Provision of Basic Generation Serv., 205 N.J. at 347.  We are "in no way bound by an agency's interpretation of a statute or its determination of a strictly legal issue," in particular "when 'that interpretation is inaccurate or contrary to legislative objectives.'"  Russo v. Bd. of Trs., Police & Firemen's Ret. Sys., 206 N.J. 14, 27 (2011) (quoting Mayflower Sec. Co. v. Bureau of Sec., 64 N.J. 85, 93 (1973)).  We therefore "apply de novo review to an agency's interpretation of a statute or case law."  Ibid. (quoting Toll Bros. v. Twp. of Windsor, 173 N.J. 502, 549 (2002)).

"In reviewing administrative adjudications, an appellate court must undertake a 'careful and principled consideration of the agency record and findings.'"  In re Adoption of Amends. to N.E., Upper Raritan, Sussex Cnty., 435 N.J. Super. 571, 584 (App. Div. 2014) (quoting Riverside Gen. Hosp. v. N.J. Hosp. Rate Setting Comm'n, 98 N.J. 458, 468 (1985)).  If our "review of the record leads us to conclude that the agency's finding is clearly erroneous, the decision is not entitled to judicial deference and must be set aside."  Ibid.

On appeal, the judicial role in reviewing all administrative action is generally limited to three inquiries:

> (1) whether the agency's action violates express or implied legislative policies, that is, did the agency follow the law; (2) whether the record contains substantial evidence to support the findings on which the agency based its action; and (3) whether in applying the legislative policies to the facts, the agency clearly erred in reaching a conclusion that could not reasonably have been made on a showing of the relevant factors.
>
> [Allstars Auto. Grp., Inc. v. N.J. Motor Vehicle Comm'n, 234 N.J. 150, 157 (2018) (quoting In re Stallworth, 208 N.J. 182, 194 (2011)).]

The party challenging an administrative regulation has the burden of proving the regulation is either invalid because the agency failed to substantially comply with the APA or is otherwise "arbitrary, capricious, or unreasonable." See N.J. State League of Muns., 158 N.J. at 222. See also Bergen Pines Cnty. Hosp., 96 N.J. at 477 ("The burden is on the plaintiff to overcome the[] presumptions" of "validity and reasonableness").

IV.

Failure to Comply with the APA, N.J.S.A. 52:14B-4(c)

In the first point of their merits brief, appellants argue the emergency rulemaking was invalid because the Council had ongoing knowledge of the increased bear population well before respondents' decision to promulgate

19

emergency rulemaking for the 2022 hunt. Appellants assert the Council generally recognized a need for a hunt in March 2021, when it considered but failed to adopt the 2021 CBBMP and – at the very latest – the Council's numerical data showed a statistical increase in human-bear interactions beginning in January 2022. Under either time frame, appellants assert there was no need to adopt emergency rulemaking on fewer than thirty days' notice, without the formal notice and comment period set forth in N.J.S.A. 52:14B-4(a). Appellants emphasize the emergency rulemaking in the present matter must be invalidated because the APA's emergency rulemaking procedures do not permit an agency to delay action "to manufacture an emergency." Relatedly, although without citation to caselaw, appellants claim the emergency rulemaking was invalid because there was no imminent peril to the public health, safety, or welfare as required under N.J.S.A. 52:14B-4(c).

Respondents counter that appellants' foreseeability-of-the-harm argument is misplaced. Citing our decision in <u>Matter of Assignment of Producers to Travelers Group</u>, 261 N.J. Super. 292, 303 (App. Div. 1993), respondents argue because the circumstances here supported their finding of imminent peril, the emergency rule cannot be invalidated "just because [they] could have approved it sooner." Thus, they contend appellants' reliance on non-binding precedent

from other jurisdictions on this issue is non-persuasive. Respondents also assert their action was consistent with "a careful and incremental" attempt to address the increasing population with non-lethal methods, which "was not static, but worsened as 2022 progressed." Arguing "the Council's finding of imminent peril and the Governor's concurrence were amply supported by scientific data and other substantial credible evidence in the record," respondents urge us to defer to their decision.

New Jersey courts have addressed emergency rulemaking under the APA. See, e.g., Del. Bay Waterman's Ass'n of N.J. v. N.J. Dep't of Env't Prot., 153 N.J. 345 (1998); County of Hudson v. State, Dep't of L. & Pub. Safety, 328 N.J. Super. 308 (App. Div. 2000). However, the parties have not cited, nor has our research revealed, any New Jersey authority that has squarely considered whether an agency improperly delayed action before promulgating emergency rulemaking under the APA. Nor are we convinced that this court's decision in Travelers supports respondents' argument.

The genesis of the emergency rulemaking in Travelers was the expiration of the Market Transition Facility (MTF), an "interim mechanism" created by the Fair Automobile Insurance Reform Act of 1990, N.J.S.A. 17:33B-1 to -64 (FAIRA) to enable poor risk consumers to purchase car insurance. 261 N.J. at

21

296-97.  To further its "take all comers" scheme, FAIRA mandated replacement of the MTF, prior to its 1992 expiration, by "a producer assignment program" established by the Commissioner of Insurance (COI).  Id. at 298-99.  Although published for notice and comment by the COI in 1991, the proposed rules were not adopted, which was "at least partly attributable to the ongoing evolution" of the program.  Id. at 299 (emphasis added).  Thereafter, the COI enacted a September 1992 emergency rule implementing the program, accompanied by a statement of imminent peril.  Id. at 300.

The insurers challenged the emergency rulemaking, asserting it was necessitated by the COI's delay in failing to address the expiring MTF.  Id. at 302.  Judge Pressler, writing for this court, rejected the argument.  Id. at 303.  The court was satisfied that before the emergency rule was enacted, the COI "had been making extensive efforts to promulgate a plan that would be fair and reasonable in terms of all the competing interests involved."  Id. at 303.  Concluding "the insurers t[ook] too narrow a view of the scope of a remediable emergency," the court held "it is not a necessary component of an 'emergency' that it be sudden or unforeseen."  Ibid. (quoting Worthington v. Fauver, 88 N.J. 183, 195 (1982)).

Unlike the COI's "extensive efforts" to address the issue before resorting to emergency rulemaking, which we found acceptable in Travelers, the agencies in the present matter were well aware of the increasing bear problem since at least as early as March 2021, when they proposed the 2021 CBBMP. Notwithstanding respondents' argument that the bear problem "worsened as 2022 progressed," the record demonstrates respondents proposed the 2022 CBBMP without any substantive changes from the 2021 CBBMP. Because both CBBMPs reflected the same objectives, figures, and recommendations for a hunt – other than "some minor editorial changes" – the substantial similarities between the two CBBMPs undercut respondents' position that their delay in proposing emergency rulemaking was attributable to their "incremental steps" approach to address the bear issue.

Given the absence of New Jersey authority addressing agency delay under the APA's emergency rulemaking provision, appellants urge us to consider federal caselaw interpreting emergency rulemaking requirements under the Federal Administrative Procedure Act (Federal APA), 5 U.S.C. §§ 551 to 559. Under the Federal APA, "[t]he required publication or service of a substantive rule shall be made not less than 30 days before its effective date, except . . . as otherwise provided by the agency for good cause found and published with the

A-1019-22

rule."  5 U.S.C. § 553(d)(3).  A federal "[a]gency must overcome a high bar if it seeks to invoke the good cause exception to bypass the notice and comment requirement."  United States v. Valverde, 628 F.3d 1159, 1164 (9th Cir. 2010).

Significantly, the Federal APA's good cause requirement "cannot arise as a result of the agency's own delay."  Nat. Res. Def. Council v. Nat'l Highway Traffic Safety Admin., 894 F.3d 95, 114 (2d. Cir. 2018).  Otherwise, "an agency unwilling to provide notice or an opportunity to comment could simply wait until the eve of a statutory, judicial, or administrative deadline, then raise up the 'good cause' banner and promulgate rules without following [Federal] APA procedures."  Id. at 114-15 (quoting Council of S. Mtns. v. Donovan, 653 F.2d 573, 581 (D.C. Cir. 1981)); see also Regeneron Pharms., Inc. v. U.S. Dep't of Health & Hum. Servs., 510 F. Supp. 3d. 29, 47, 50-51 (S.D.N.Y. 2020) (issuing an injunction that barred the implementation of an emergency rule where the agency had been "aware of [the] problem for years and [had nonetheless] failed to act"); Wash. All. of Tech. Workers v. U.S. Dep't of Homeland Sec., 202 F. Supp. 3d 20, 27 (D.D.C. 2016) (invalidating emergency rulemaking where the agency had "long planned" to take the action).

Although we are not bound by the federal authority cited, we are persuaded the reasoning underscoring these decisions applies when an agency

A-1019-22

unreasonably delays emergency rulemaking. The federal "good cause" standard for emergency rulemaking, explicitly stated in 5 U.S.C. § 553(d)(3), is not unlike the imminent peril requirement under N.J.S.A. 52:14B-4(c). Not surprisingly, federal courts have recognized an "imminent threat to public safety" provides a sufficient basis for emergency action under the Act. Valverde, 628 F.3d 1159, 1165.

New Jersey courts have allowed emergency rulemaking based on imminent peril in certain circumstances. See Del. Bay, 153 N.J. at 347 (finding mootness but nonetheless sanctioning an earlier finding of imminent peril to address a shortage of horseshoe crab eggs, which threatened a species of shorebirds); see also County of Hudson, 328 N.J. Super. at 316 (approving a finding of imminent peril in jail overcrowding which would cause "operational instability, and have a negative effect upon the safety and security of staff, the juveniles, and the public").

Even were we to assume a legitimate peril existed from increased human-bear interactions during 2022, the Council's failure to timely act belies any assertion of imminence, particularly because there was sufficient time for formal rulemaking after the nearly identical 2021 CBBMP was not adopted by emergency rulemaking. Again, the 2022 CBBMP was substantively unchanged

from the rejected 2021 CBBMP. Neither CBBMP included new tools to accomplish the Council's goal of bear population management nor factors for consideration to achieve that goal.

Moreover, respondents' contentions are undercut by the Council's statistics. According to the Bureau of Wildlife Management's monthly reports from January 2022 to October 2022, the bear population increased substantially from corresponding months during 2021. As one notable example, according to the March 2022 monthly report: "As of March 21, 2022, the total number of calls received increased 204.2 percent from the same time period in 2021. Category I incidents increased 800.0 percent, Category II calls increased 640.0 percent and Category III calls had a 50.0 percent increase from 2021."[4]

Based on our review of the record, there was no peril that was not known prior to the November 15, 2022 emergency rulemaking. We therefore conclude the Council's finding of imminent peril was clearly erroneous. Relatedly, there was no need to enact the 2022 CBBMP on fewer than thirty days' notice. At the

_____

[4] According to an excerpt of the 2005 CBBMP provided in appellants' appendix: "Category I black bears are those exhibiting behavior that is an immediate threat to human safety or which cause agricultural damage to farmland"; "Category II black bears are nuisance bears which are not a threat to life and property"; and "Category III bears are animals that are exhibiting normal behavior and are not creating a threat to the safety of the public or a nuisance."

A-1019-22

latest, the Council had confirming information of a marked increase in the black bear population in early 2022 but did not consider a revised bear management plan until November 2022. Moreover, the 2022 CBBMP relied on the same data as the 2021 CBBMP. The lack of immediate response thus undermines the Council's assertion of imminence.

* * * *

In conclusion, we recognize the 2022 black bear hunt, authorized under the invalid emergency rulemaking, has come and gone – and the resulting "harvesting" of black bears during that hunting season cannot be undone. We understand the 2022 CBBMP and amendments to the Game Code rule were recently adopted pursuant to formal rulemaking. Nonetheless, the judicial history of the black bear hunt in this state is a clear indication that the issues decided on appeal concern matters of public interest. See Reilly, 194 N.J. at 484. Indeed, the very essence of appellants' argument is that the emergency rulemaking deprived the public the opportunity of meaningful notice and comment and the opportunity to present expert testimony in response to Golden's presentation. See Cooperman, 209 N.J. Super. at 202. We therefore cannot defer to respondents' emergency rulemaking here, regardless of the rule's expiration. See In re Provision of Basic Generation Serv., 205 N.J. at 347.

Reversed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1019-22